AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>SLAVCO IGNJATOV and<br>VALENTINO HRISTOVSKI | DOCKET NO.<br><br>CLERK, U.S. DISTRICT COURT<br>OCT 3 0 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY cm<br><br>MAGISTRATE'S CASE NO.<br>17 MJ02687-1 |
|---|---|

Complaint for violation of Title 21, United States Code, Section 846

| NAME OF MAGISTRATE JUDGE<br>HONORABLE PATRICK WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>October 23, 2017 | PLACE OF OFFENSE<br>Riverside County and<br>San Bernardino County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 846]

Beginning on an unknown date and continuing until on or about October 23, 2017, in Riverside County and San Bernardino County, within the Central District of California, defendants SLAVCO IGNJATOV and VALENTINO HRISTOVSKI, and others known and unknown, conspired and agreed with one another to knowingly and intentionally distribute and possess with intent to distribute cocaine, a Schedule II controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**HANNAH MONROE** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>October 30, 2017 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Victoria A. Degtyareva x1635   REC: Detention

## AFFIDAVIT

I, Hannah Monroe, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against and arrest warrants for SLAVCO IGNJATOV ("IGNJATOV") and VALENTINO HRISTOVSKI ("HRISTOVSKI") for a violation of Title 21, United States Code, Section 846 (Conspiracy to Distribute and Possess with Intent to Distribute Cocaine).

2.  This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), which were seized during a stop of IGNJATOV and HRISTOVSKI on October 23, 2017, and which are currently in the custody of the Federal Bureau of Investigation in Fontana, California, as described more fully in Attachment A, which is incorporated herein by reference:

a.  One Motorola Moto XT1767 touch screen phone bearing FCC ID number 1HDT56WC1 (the "MOTO"), and

a.  One Blackberry Bold smart phone model RDE71UW bearing FCC ID number L6ARDE70UW (the "BLACKBERRY").

3.  The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence or fruits of violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii)(II) (Distribution of and Possession with Intent to Distribute Cocaine) and 846 (Conspiracy to Distribute and Possess with Intent to Distribute

Cocaine), as described more fully in Attachment B, which is also incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF FBI SPECIAL AGENT HANNAH MONROE

5.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for approximately one and a half years. Prior to becoming an SA, I was a Staff Operations Specialist with the FBI for approximately two years.  I am currently a member of the FBI's Transnational Organized Crime – Eastern Hemisphere squad in Los Angeles, California.

6.    Since joining the FBI in 2014, I have received training in the investigation of violations of criminal law, such as drug-trafficking, computer-related crimes, and financial fraud, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia.  During the time that I have been employed by the FBI, I have participated in investigations relating to organized crime, home-grown violent

Instrumentality Protocol

extremism, access device fraud, identity theft, narcotics, and computer intrusions.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants.  Additionally, I have interviewed and/or debriefed informants, and other witnesses who had personal knowledge regarding the investigations in which I have been involved.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    The Los Angeles Police Department ("LAPD") and the FBI have been investigating a drug trafficking organization ("DTO") run by an unidentified individual known as "The Boss" ("BOSS") that traffics cocaine from Los Angeles to Toronto, Canada.  On March 16, 2017, investigating agents seized packages containing approximately 194 kilograms of cocaine from Djordje KARAC ("KARAC"), who was driving a truck owned by IGNJATOV's company, Bo-Mak Express Inc. ("BO-MAK").  KARAC received the cocaine earlier that day from a target of the investigation who later agreed to cooperate with law enforcement ("CHS1").

8.    After the seizure, CHS1 had discussions with BOSS over encrypted Blackberry devices about conducting "dry runs" of legal substances to determine whether law enforcement was aware of the DTO's narcotics route.  On October 23, 2017, IGNJATOV and HRISTOVSKI were intercepted conducting one of these dry runs, during which they drove a BO-MAK truck on a route that was almost identical to the route used by KARAC in March 2017 and

Instrumentality Protocol

received a duffle bag containing bags of sugar from an unknown individual.  HRISTOVSKI was found in possession of a Blackberry device that was similar to the encrypted devices used by other members of the BOSS DTO.  On October 28, 2017, IGNJATOV and HRISTOVSKI were intercepted at the U.S.-Canadian border at Port Huron, Michigan and arrested.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my participation in this investigation, as well as my review of investigative and arrest reports and my conversations with other law enforcement officers who participated in this investigation, I know the following information.

### A.    Background of Investigation

10.    Since early 2016, the LAPD and the FBI have been investigating a drug trafficking organization ("DTO") in the Los Angeles area that traffics cocaine from Los Angeles to Chicago, from where it is eventually sent to Toronto, Canada.  I am the case agent for this investigation.

11.    The investigation has revealed that the leader of the aforementioned DTO is an unidentified man known only as "The Boss" ("BOSS"), who is currently believed to be living in Mexico City, Mexico.  BOSS directs the transportation of narcotics from Los Angeles to Canada.  BOSS communicates with his employees solely through the use of encrypted devices.  These encrypted devices use military grade end-to-end encryption, which is installed on Blackberry cell phones that have been altered to remove all functionality except for closed-network text

Instrumentality Protocol

messaging.  Such devices are commonly used by criminal organizations because their communications cannot be intercepted by law enforcement and because the devices can be remotely wiped in the event that they are seized by law enforcement.

**B.    Seizure of 194 Kilograms of Cocaine from KARAC in Truck Owned by IGNJATOV**

12.  CHS1[1] was initially a target of this investigation and was suspected of obtaining cocaine from sources of supply and distributing it to couriers for eventual distribution in Canada.

13.  On March 16, 2017, an LAPD surveillance team, whose reports I have reviewed, established surveillance at CHS1's primary residence in Long Beach, California ("Primary Residence"), and observed CHS1 leaving the residence and driving to his/her stash house in Redondo Beach, California ("Stash House").  Shortly after CHS1's arrival to the Stash House, an unidentified man ("UM1") arrived at the Stash House.  CHS1 removed two cardboard boxes from the Stash House and handed UM1 a third small box.  UM1 then departed the area.  CHS1 drove back to his/her Primary Residence and carried the two cardboard boxes s/he retrieved from the Stash House along with a small bag into the Primary Residence.  Later, CHS1 loaded what appeared to be duffle bags into the rear hatch of his/her vehicle.

---

[1] CHS1's criminal history includes the following: in 2000, CHS1 was arrested for embezzlement; in 2001, CHS1 was arrested for a DUI; in 2003, CHS1 was arrested for possession of marijuana for sale; in 2010, CHS1 was arrested for possession of a controlled substance; in 2013, CHS1 was arrested for a DUI and driving without a license.  The information that CHS1 provided to law enforcement has been corroborated by physical surveillance, audio recorded conversations, text messages, and interviews with other individuals, and CHS1 was believed to be credible and reliable by investigators.

Instrumentality Protocol

14.   Approximately one hour later, CHS1 left the area in
the vehicle into which s/he had placed the duffle bags, and
drove to De Forest Circle south of Hopkins Street in Mira Loma,
California.  S/he parked at the north curb, facing west,
directly in front of a white semi-truck, bearing an Ontario,
Canada license plate 3636PL.  The semi-truck had the logo Bo-Mak
Express Inc. ("BO-MAK") on the door.  CHS1 met with the driver
of the BO-MAK semi-truck, who was later identified as KARAC.
CHS1 removed a total of ten duffle bags from his/her vehicle and
handed each of them individually to KARAC, who helped load them
into the cab of the BO-MAK semi-truck.  Because CHS1 was seen
visibly putting effort into the handling of the duffle bags,
LAPD officers conducting surveillance believed the duffle bags
were each very heavy.

15.   LAPD officers observed KARAC step out of the cab of
the semi-truck and shake hands with CHS1 before the two broke
contact.  CHS1 entered his/her vehicle and drove away.  KARAC
drove the BO-MAK semi-truck to the parking lot of "Cowboy
Burgers and BBQ" located at 11673 S. Etiwanda Ave, Fontana,
California, where he stayed for nearly five hours.  During this
time, KARAC was observed moving around in the cab, but he did
not exit the semi-truck.  That evening, KARAC left the
restaurant parking lot in the semi-truck and California Highway
Patrol ("CHP") conducted a traffic stop due to the fact that the
semi-truck was traveling in the number two lane, a violation of
the California Vehicle Code.  CHP searched the truck and located
the ten duffle bags that CHS1 had given to KARAC inside the cab

Instrumentality Protocol

of the truck.  Each duffle bag contained cocaine, which was later determined to be a total of approximately 194 kilograms. The San Bernardino County Sherriff's Department tested the seized substance and confirmed that it contained cocaine.  Based on the physical surveillance of CHS1 on March 16, 2017, and his/her meeting with KARAC, I believe that CHS1 transferred the 194 kilograms of cocaine from CHS1's vehicle to KARAC.

16.  In a post-arrest interview on March 16, 2017, after being Mirandized, KARAC stated that an individual named "Slavco," later identified as IGNJATOV, was the boss of BO-MAK and owned several trucks and trailers.

17.  KARAC was charged with violations of California Health & Safety Code Sections 11351 (Possession of Cocaine for Sales) and 11352 (Transportation of Cocaine for the Purpose of Sales). KARAC has since pled guilty to the charges.

18.  On March 18, 2017, IGNJATOV contacted the Peel Regional Police Department in Ontario, Canada, and filed a missing person report for KARAC.  In the report, IGNJATOV stated that he was KARAC's brother-in-law.  IGNJATOV also stated that he owned BO-MAK and that KARAC was a driver for his company. Per information from the Canadian Ministry of Transportation, BO-MAK records revealed IGNJATOV's company has approximately three trucks and four drivers; one of those drivers is HRISTOVSKI.

19.  On or about March 21, 2017, IGNJATOV flew into Ontario, California International Airport and picked up the BO-MAK semi-truck from which officers seized the cocaine, which was

Instrumentality Protocol

being held in police impound in Fontana, California.    IGNJATOV
drove the semi-truck across the U.S. border into Canada on or
about March 30, 2017.

20.    An FBI records check revealed a 2014 narcotics
investigation, during which IGNJATOV was suspected of using a
BO-MAK truck to attempt to transport narcotics from New York to
Canada.[2]

---

[2] In 2014, the FBI in New York conducted an investigation
into an organization involved in trafficking narcotics from the
United States to Canada.  A target of that investigation, Milos
Antic ("Antic"), arranged on three separate occasions for a
semi-truck to travel to New York to pick up loads of cocaine.
IGNJATOV was identified as one of the truck drivers who came to
New York to pick up the cocaine.  IGNJATOV was captured on
consensually recorded phone calls attempting to pick up the
cocaine.  On August 8, 2014, a confidential human source working
with FBI in New York ("CHS2") had a recorded telephone call with
a Canadian truck driver using telephone number 646-492-7177,
which was registered to IGNJATOV.  The user of telephone number
646-492-7177 (believed to be IGNJATOV) said he would have his
truck loaded with a legitimate cover load and would meet CHS2 in
the Yonkers area.  In a follow-up phone call later that day with
CHS2, IGNJATOV said he was still waiting to get loaded and may
have to come back the following Monday.  On August 11, 2014,
during another recorded phone call between CHS2 and IGNJATOV,
they agreed to meet the following day for the transfer of
cocaine.  The following day, on August 12, 2014, CHS2 met
another target of the investigation, Mladen Lukic ("Lukic"), at
40 West 225th St, Bronx, New York.  Investigators believe Lukic
was expecting to pick up 100 kilograms of cocaine from CHS2 and
then transfer the cocaine to IGNJATOV to transport across the
Canadian border.  Law enforcement officers conducted a staged
arrest of CHS2 where Lukic could see the arrest.  Officers also
saw a semi-truck bearing Ontario license plate 3644PL with an
attached semi-trailer bearing Ontario license plate K2149P in
the area.  A query of the license plates revealed the truck and
trailer were owned by BO-MAK.  Immigration records revealed
that, on August 11, 2014, IGNJATOV entered the United States
from Canada.  Based on my discussions with the other law
enforcement officials involved in this investigation and my
review of transcripts of the consensually recorded calls between
CHS2 and IGNJATOV, I believe that IGNJATOV was present in the
area during the cocaine transfer on August 12, 2014, and that

Instrumentality Protocol

## C.   Discussions About "Dry Runs"

21.   On March 19, 2017, a few days after the seizure of approximately 194 kilograms of cocaine from KARAC, during a consensually recorded conversation, which I have listened to, CHS1 (before CHS1 began cooperating with law enforcement) discussed with a confidential human source ("CHS3")[3] how a test load should be conducted before shipping any additional cocaine. CHS1 stated, "What we need to do is do a dry run.  And I want to put like a bunch of flour in it or something."

22.   Based on my training, experience, discussions with CHS1 and CHS3, and knowledge of this investigation, I believe when CHS1 referred to doing a "dry run," s/he was referring to transporting a legal substance in a manner consistent with a real narcotics shipment.  Based on my training and experience, I know that drug traffickers often conduct such "dry runs" using substances such as flour or sugar to determine if law enforcement is aware of the methods, means, and persons used by the DTO to transport narcotics, and that it is common for drug traffickers to conduct such dry runs after a large seizure of narcotics from the organization by law enforcement.

---

IGNJATOV was waiting to pick up the cocaine to transport it into Canada.

[3] CHS3 has provided reliable information that, in part, has been corroborated by physical surveillance, audio recorded conversations, text messages, documentary evidence, and interviews with other individuals/defendants.  CHS3's primary motivation to cooperate is to obtain a lesser sentence in a federal prosecution related to his/her role in a drug trafficking organization.  CHS3 has three prior DUI convictions and a 2008 disorderly conduct conviction.

Instrumentality Protocol

23.   On May 10, 2017, law enforcement executed federal search warrants at CHS1's Primary Residence and CHS1's Stash House.[4]  Following the execution of the search warrants, CHS1 agreed to cooperate with law enforcement in the hopes of potential charging and/or sentencing consideration for his/her participation in drug trafficking activities, including the activities of the DTO at the center of this investigation.

24.   During the search of CHS1's Primary Residence, investigators found multiple encrypted devices belonging to CHS1.  CHS1 provided investigators with the passwords for the devices so the historic messages could be reviewed and photographed.

25.   A review of CHS1's encrypted Blackberry devices revealed numerous encrypted messages between CHS1 and BOSS discussing dry run shipments as a method for testing routes after the seizure of 194 kilograms of cocaine on March 16, 2017. These conversations occurred before CHS1 began cooperating with law enforcement:

a.   On April 21, 2017, at approximately 8:14 a.m., CHS1, using the profile name "Rena," contacted the "Boss," using the screen name "Xxxghost,"[5] via an encrypted device.  In this

---

[4] The search of CHS1's Primary Residence revealed approximately 24 kilograms of MDMA, 12 kilograms of marijuana, 27 un-registered weapons, several hundred rounds of ammunition of various calibers, multiple high capacity magazines, and a law enforcement style Taser.  The search of CHS1's Stash House revealed drug paraphernalia and various chemicals and cutting agents for narcotics.

[5] BOSS uses numerous screen names including "Xxxghost," "Super7," and "Superman."  Encrypted device users can change

Instrumentality Protocol

conversation, CHS1 told BOSS that CHS3 is "Chompin at bit now to send empty bullets." Based on my training, experience, and knowledge of this investigation, I believe when CHS1 discussed sending "empty bullets," CHS1 was referring to the shipment of a legal substance other than narcotics in a manner consistent with a real narcotics shipment for the purpose of determining if law enforcement is aware of the methods, means, and persons used by the DTO to transport narcotics.

b.   A few minutes later, at approximately 8:19 a.m., BOSS, using the screen name "Xxxghost," replied to CHS1, using the profile name "Rena." BOSS told CHS1 "to start sending dry runs let's have doing dry runs for a month before we make them live." Based on my training, experience, and knowledge of this investigation, I believe when BOSS told CHS1 to start "sending dry runs," he was referring to sending a legal substance other than narcotics in a manner consistent with a real narcotics shipment for the purpose of determining if law enforcement is aware of the methods, means, and persons used by the DTO to transport narcotics.

c.   A few days later, on or about April 25, 2017, at approximately 2:47 p.m., CHS1, using the profile name "Rena," contacted BOSS, using the screen name "Xxxghost," via an encrypted device. In this conversation, CHS1 told BOSS that CHS1 met up with CHS3 and that the "First order went just fine made em tape it up w special tamper proof tape and take pics and

_____

their screen names, but the email address connected to the device always remains the same.

Instrumentality Protocol

it wasn't fucked with.  Sending another load this week."  CHS1
also said that CHS1 wanted to "Test every angle."  Based on my
training, experience, and knowledge of this investigation, I
believe that, in the above-quoted conversation, CHS1 was
describing to BOSS a successful dry run that CHS1 conducted,
which was not intercepted by law enforcement ("first order went
just fine"; "it wasn't fucked with").  I further believe that
CHS1 told BOSS s/he wanted to continue testing routes by doing
more dry runs ("Test every angle") to ensure law enforcement was
not aware of the methods or means being used by the DTO to
transport real narcotics.

        d.   On May 6, 2017, at approximately 10:03 a.m.,
CHS1, using the profile name "Rena," contacted BOSS, using the
screen name "Super7," via an encrypted device.  In this
conversation, CHS1 told BOSS that "We got our other shipment in
and everything was as it should."  Based on my training,
experience, and knowledge of this investigation, I believe when
CHS1 told BOSS that they got the "shipment" and "everything was
as it should be," CHS1 was referring to completing another
successful dry run.

        26.  After CHS1 began cooperating, at law enforcement
agents' direction, s/he continued to communicate with BOSS via
CHS1's encrypted Blackberry devices to discuss the seizure of
194 kilograms of cocaine that occurred on March 16, 2017 and
future cocaine shipments.  CHS1 would communicate with BOSS at
my direction and would later show me the messages which s/he
exchanged with BOSS, which I photographed:

                                        Instrumentality Protocol

a.   On or about May 15, 2017, at approximately 2:45 p.m., BOSS, using the screen name "Superman," sent a message to CHS1, using the profile name "Piun," on an encrypted device. The message stated: "As for brothers all quiet waiting on next court date to see what happens if feds take it over or not.  We should get going soon pal."  Based on my knowledge of this investigation as well as my discussions with CHS1, I believe when BOSS said the "brothers," he was referring to IGNJATOV and his brother-in-law KARAC, who at that time had pending state charges arising from the seizure of cocaine he received from CHS1.  I believe that BOSS wanted to ensure that there was no federal interest in KARAC's case ("if feds take it over or not") before conducting real narcotics shipments again, as opposed to dry runs, with IGNJATOV and CHS1.

27.   On June 6, 2017, CHS1 died.  The autopsy report revealed that CHS1 died of a drug overdose.

**D.   Interception of IGNJATOV and HRISTOVSKI Conducting Dry Run**

28.   On October 19, 2017, I was notified by a Customs and Border Patrol ("CBP") agent that IGNJATOV and HRISTOVSKI were entering the United States from Canada through Port Huron, Michigan with a BO-MAK semi-truck, bearing Ontario, Canada plate 4385PS and trailer plate 57416V ("BO-MAK SEMI").  Per a travel manifest submitted by BO-MAK, the BO-MAK SEMI was scheduled to arrive at the U.S.-Canadian border and was destined for a warehouse located in La Puente, California.  Per CBP records, this was the first trip to Los Angeles made by any truck

Instrumentality Protocol

associated with BO-MAK since the seizure of 194 kilograms of cocaine on March 16, 2017.

29.   On October 20, 2017, IGNJATOV and HRISTOVSKI entered the United States from Canada through Port Huron in the BO-MAK SEMI.  CBP officers inspected the vehicle at the border but found nothing unusual.

30.   On October 22, 2017, at approximately 4:45 p.m., an LAPD and FBI surveillance team, which I was a part of, saw the BO-MAK SEMI pull into a dead-end street located on The Sun Way and Georgia Blvd. in San Bernardino, California.  IGNJATOV and HRISTOVSKI got out of the BO-MAK SEMI and walked towards a large Walmart parking lot, where agents and detectives lost sight of them.  At approximately 8:10 p.m., IGNJATOV and HRISTOVSKI left the Walmart parking lot carrying a plastic bag and drove south bound on the 215 freeway in the BO-MAK SEMI.  The BO-MAK SEMI arrived at "Petro Center" located at 4325 E. Guasti Rd., Ontario, California, and remained there until the following day. On October 23, 2017, at approximately 12:45 p.m., the BO-MAK SEMI left the Petro Center parking lot and surveillance units followed the BO-MAK SEMI until it stopped on Philadelphia Ave. in Mira Loma, California, just west of Dulles Drive, and parked. IGNJATOV and HRISTOVSKI stayed inside the cab of the truck for approximately 45 minutes.

31.   At approximately 1:55 p.m., the BO-MAK SEMI moved approximately 150 feet in order to make a right turn southbound on Dulles Drive where it stopped behind a parked Dodge sedan with paper plates, which was driven by an unknown man ("UM2").

Instrumentality Protocol

This location is close to where KARAC met CHS1 for the hand-off of cocaine on March 16, 2017. IGNJATOV and HRISTOVSKI got out of the BO-MAK SEMI and met with UM2 between the Dodge sedan and the BO-MAK SEMI. HRISTOVSKI handed UM2 an unknown item resembling paper or money and UM2 briefly examined the item. UM2 then retrieved a small duffle bag from the trunk of the Dodge sedan and handed it to HRISTOVSKI. UM2 got back into the Dodge sedan and drove away. IGNJATOV and HRISTOVSKI walked to the cab of the BO-MAK SEMI. IGNJATOV entered the driver's side of the vehicle and HRISTOVSKI, still carrying the duffle bag, entered the passenger side of the BO-MAK SEMI and closed the door. The BO-MAK SEMI drove to "Cowboy Burger and BBQ" located at 11673 S. Etiwanda Ave, Fontana, California.

32. The route taken by IGNJATOV and HRISTOVSKI was almost identical to the route taken by KARAC when he picked up the 194 kilograms of cocaine from CHS1 on March 16, 2017, and both hand-offs occurred at around the same time of day. Specifically, on both occasions, the BO-MAK trucks entered into the San Bernardino area, stopped at locations near Etiwanda St. and Philadelphia Drive to conduct a hand-off of duffle bags, and then parked at Cowboy Burgers and BBQ immediately after the transaction was concluded.

**E.   Search of the BO-MAK SEMI**

33. At approximately 2:00 p.m. on October 23, 2017, as IGNJATOV and HRISTOVSKI were preparing to exit the BO-MAK SEMI, LAPD detectives who were conducting the surveillance detained them on suspicion of possession of a controlled substance with

Instrumentality Protocol

the intent to transport.   IGNJATOV and HRISTOVSKI consented to the search of the BO-MAK SEMI.

34.   Inside the BO-MAK SEMI, detectives found a small black duffle bag which appeared to be the same size as the one UM2 gave to HRISTOVSKI a short time earlier.   Inside the black duffle bag detectives found 15 4-pound packages of C&H Pure Sugar Cane.   Fontana Police Department responded to the scene with a trained drug detection dog to assist with the investigation.   The dog alerted to the duffle bag and to the driver's side of the trailer of the BO-MAK SEMI, indicating the presence of the odor of narcotics.   Officers then removed the sugar from the duffle bag.   The dog alerted to the empty duffle bag, indicating the presence of the odor of narcotics, but did not alert to the sugar.

35.   In the cab of the BO-MAK SEMI, officers found two one-dollar bills in the center console area.   Based on my training and experience, as well as my knowledge of the investigation, I know that members of the BOSS DTO often use serial numbers on bills of U.S. currency as a method of identification when conducting a narcotics transaction.[6]   Accordingly, I believe that

---

[6] For example, after CHS1's death, investigators used CHS1's encrypted Blackberry device to arrange to pick up approximately $20,000 in drug proceeds from a courier sent by BOSS.   Before the meeting, BOSS sent a message to CHS1's encrypted device asking for a "serial for paper."   Investigators, posing as CHS1, sent BOSS a serial number of a five dollar bill.   On June 10, 2017, a suspected co-conspirator sent a message to investigators, posing as CHS1, setting a time and place for a meeting and stating, "Please bring the bill."   The following day, an undercover agent met with the co-conspirator.   During the meeting, the co-conspirator inspected the five dollar bill that bore the serial number investigators had sent to BOSS before giving the undercover agent a bag containing $20,000.

Instrumentality Protocol

the item investigators saw HRISTOVSKI hand to UM2, which resembled paper or money, was one of these dollar bills, and that HRISTOVSKI handed the bill to UM2 so that UM2 could verify HRISTOVSKI's identity by the serial number on the bill.

36.   Detectives also found numerous cellular phones inside the cab of the BO-MAK SEMI, including a Moto phone (the "MOTO"). The packaging of the MOTO was still inside the vehicle, suggesting that the phone had just been purchased.  HRISTOVSKI and IGNJATOV both denied ownership of the phone.  Based on my training and experience, I know that it is common for drug traffickers to buy a new cell phone to use for a single drug transaction, known as a "drop" phone, so that the phone number cannot be traced back to them.  Accordingly, I believe that HRISTOVSKI and IGNJATOV likely purchased the MOTO very recently (possibly when they stopped at the Walmart the previous day) for the sole purpose of communicating with UM2 about the logistics of their meeting.

37.   During an officer safety pat down search of HRISTOVSKI, detectives located a Blackberry device (the "BLACKBERRY") in HRISTOVSKI's pants pocket.  When questioned by detectives, HRISTOVSKI said the BLACKBERRY was not his and he had found it on the ground.  HRISTOVSKI said he did not know the password for the BLACKBERRY or to whom it belonged.  IGNJATOV also said that the BLACKBERRY was not his and he did not know where it came from.  Based on my examination of the BLACKBERRY, including the password-protected screen, the BLACKBERRY was the same brand and size, and possessed the same features as many

Instrumentality Protocol

Blackberry encrypted devices that I have encountered during the course of this investigation, which members of the BOSS DTO use to securely communicate.  For example, upon KARAC's arrest on March 16, 2017, investigators took possession of a Blackberry encrypted device.  KARAC gave consent to search the encrypted device and provided the password to gain access.  Upon opening the device, investigators observed a message sent from an unknown subject to KARAC that read "194."  The number 194 corresponds to the number of kilograms of cocaine found in the truck that KARAC was driving.

38.  Based on my training and experience, my knowledge of the investigation, my discussions with CHS1 and CHS3, and my discussions with other law enforcement officers assigned to this investigation, I believe that IGNJATOV and HRISTOVSKI came to the Los Angeles area to conduct a dry run on behalf of BOSS.  I believe that the purpose of this dry run was to test the route previously used by KARAC in order to determine whether the route was safe to use again for the transportation of real cocaine.

**F.   Arrest of IGNJATOV and HRISTOVSKI**

39.  On October 28, 2017, at approximately 8:30 p.m. (EDT), special agents from the Border Enforcement Security Task Force ("BEST") Port Huron observed the BO-MAK SEMI enter the Duty Free parking lot next to the CBP Port of Entry, Port Huron, Michigan.  At approximately 8:45 p.m. (EDT), the BO-MAK SEMI exited the Duty Free parking lot and attempted to leave the United States for Canada.  At that time, CBP officers came into

Instrumentality Protocol

contact with the BO-MAK SEMI and directed IGNJATOV and
HRISTOVSKI to the CBP secondary inspection area.

40.   About thirty minutes later, Homeland Security
Investigations SA Greg Abair made contact with IGNJATOV and
HRISTOVSKI, separately, and arrested them for conspiracy to
traffic cocaine.  Agent Abair separately read both IGNJATOV and
HRISTOVSKI their <u>Miranda</u> rights, and both expressed a desire to
speak with an attorney.  No further questioning was conducted.

## V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

41.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
device sometimes in fictitious and/or other individuals' names
and maintain telephone and address books, telephone bills, and
other books and papers that reflect names, addresses, and/or
telephone numbers of their associates in the narcotics
trafficking organization and customers of their narcotics
business.

b.   Drug traffickers use mobile phones to conduct
drug trafficking operations, including communicating with
suppliers, customers, and co-conspirators by phone, text
message, e-mail, and social media.  Drug traffickers generally
do not conduct transactions for large amounts without first
communicating matters such as quantity, price, arrival time, and
meet location, often through a telephone or mobile device such

Instrumentality Protocol

as the SUBJECT DEVICES.  Further, drug traffickers will also use
text messages to send photographs as codes or actual pictures of
the contraband being trafficked as part of narcotics
transactions.

        c.    I know that it is common for drug traffickers to
own multiple phones of varying sophistication and cost as a
method to diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
utilizing digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

        d.    Drug traffickers engaged in the importation and
transportation of large quantities of drugs, and in the
laundering of drug-trafficking proceeds, also commonly store
records related to their drug-trafficking operations on digital
devices, including mobile phones.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

        42.   Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

        e.    Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital

Instrumentality Protocol

devices and software programs in use today that it takes time to
conduct a thorough search.  In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

      f.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

      g.   It is difficult to estimate the precise storage
space contained on the devices listed in Attachment A before
conducting a preliminary examination of the devices, but, based
on my training and experience, I know that cellular telephones
can contain multiple gigabytes of storage space.  A single
megabyte of storage space is the equivalent of 500 double-spaced
pages of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of
text.

      h.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.
Electronic files saved to a hard drive can be stored for years

Instrumentality Protocol

with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a digital device, the data contained in the file does
not actually disappear; rather, that data remains on the hard
drive until it is overwritten by new data.  Therefore, deleted
files, or remnants of deleted files, may reside in free space or
slack space, i.e., space on a hard drive that is not allocated
to an active file or that is unused after a file has been
allocated to a set block of storage space, for long periods of
time before they are overwritten.  In addition, a digital
device's operating system may also keep a record of deleted data
in a swap or recovery file.  Similarly, files that have been
viewed on the Internet are often automatically downloaded into a
temporary directory or cache.  The browser typically maintains a
fixed amount of hard drive space devoted to these files, and the
files are only overwritten as they are replaced with more
recently downloaded or viewed content.  Thus, the ability to
retrieve residue of an electronic file from a hard drive depends
less on when the file was downloaded or viewed than on a
particular user's operating system, storage capacity, and user
habits.  Recovery of residue of electronic files from a hard
drive requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

         i.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital

Instrumentality Protocol

22

devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the digital device was in use. Digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized

Instrumentality Protocol

tools and a controlled laboratory environment, and also can require substantial time.

j.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

k.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a

Instrumentality Protocol

24

process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

43.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

44.  Based on the foregoing, there is probable cause to believe that SLAVCO IGNJATOV and VALENTINO HRISTOVSKI violated Title 21, United States Code, Section 846 (Conspiracy to Distribute and Possess with Intent to Distribute Cocaine).

//

//

//

//

//

//

//

//

//

//

Instrumentality Protocol

45.   There is also probable cause to believe that evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found on the digital devices described in Attachment A.

Hannah Monroe
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me this 30th day of October 2017.

HONORABLE PATRICK WALSH
UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol