STEVEN F. GRUEL (SBN 213148)
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net
www.gruellaw.com

Attorney for Defendant SLAVCO IGNJATOV

MARILYN E. BEDNARSKI (SBN 105322)
Kaye, Mclane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone Number (626) 844-7660
Fax Number (626) 844-7670
mbednarski@kmbllaw.com

Attorney for Defendant VALENTINO HRISTOVSKI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SLAVCO IGNJATOV, et al., <br><br> Defendants. | No. ED CR 17-222-JGB <br><br> JOINT NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI; DECLARATIONS <br><br> Date: June 11, 2018 <br><br> Time: 2:00 p.m. <br><br> Honorable Jesus G. Bernal |

# **TABLE OF CONTENTS**

*United States v. Slavco Ignjatov et al.*

Page

NOTICE OF MOTION ........................................................1

I. INTRODUCTION/SUMMARY OF ARGUMENT ...........................................2

II. SUMMARY OF FACTS ........................................................3

  A. The March, 2017 arrest of Karac and seizure of 194 kilograms of cocaine...3

  B. Investigators focus on Ignjatov and learn of possible "dry runs" .................4

  C. Government monitoring of Ignjatov and Hristovski ......................................4

III. THE GOVERNMENT'S WARRANTLESS APPLICATION OF A GPS DEVICE AND EXTENSIVE MONITORING OF DEFENDANTS' TRUCK WAS UNREASONABLE AND VIOLATED THEIR FOURTH AMENDMENT RIGHTS ........................................................6

  A. The application of the GPS device at the border constituted a search within the meaning for the Fourth Amendment for which a warrant was required ......8

    1. Under *Jones*, the warrantless use of GPS devices is illegal when their application requires a trespass ........................................................8

    2. Even under the "border search" and "extended border search" exceptions to the warrant requirement, the application of the GPS device in this case was illegal ........................................................9

i

   a. The application of a GPS device during a border search of the defendants' truck was unreasonable and not supported by reasonable suspicion or probable cause ...................................................................10

   b. The application of the GPS device and the continuous monitoring of the defendants cannot be justified pursuant to the extended border search doctrine ...............................................................................................13

B.  The defendants had a reasonable expectation of privacy in their location data, which was intercepted and monitored remotely for 8 days and over the course of more than 4,000 miles traveled.......................................................15

C. Because the search and seizure of the GPS location data was illegal, all observations of the defendants, and any statements or evidence derived from the illegal search must be suppressed .................................................................19

IV. CONCLUSION.............................................................................................21

# TABLE OF AUTHORITIES

*United States v. Slavco Ignjatov et al.*

*Almeida-Sanchez v. United States,*
    413 U.S. 266 (1973) ........................................................................7

*Katz v. United States,*
    389 U.S. 347 (1967) ...............................................................15, 16

*Ma v. Ashcroft,*
    257 F.3d 1095 (9th Cir. 2001) .....................................................7

*Murray v. United States,*
    487 U.S. 533 (1988) ......................................................................6

*Nardone v. United States,*
    308 U.S. 338 (1939) ......................................................................7

*Silverman v. United States,*
    365 U.S. 505 (1961) ......................................................................6

*United States v. Abbouchi,*
    502 F.3d 850 (9th Cir. 2007) .....................................................14

*United States v. Caicedo-Guarnizo,*
    723 F.2d 1420 (9th Cir. 1984) ...................................................14

*United States v. Chadwick,*
    433 U.S. 1 (1977) ..........................................................................6

*United States v. Cotterman,*
    709 F.3d 952 (9th Cir. 2013) ................................................10-11

*United States v. Duncan,*
    693 F.2d 971 (9th Cir. 1982) .....................................................11

*United States v. Flores-Montano,*
    541 U.S. 149 (2004) ......................................................................9

*United States v. Guzman-Padilla,*
    573 F.3d 865 (9th Cir. 2009).................................................................13, 14

*United States v. Jones,* 565 U.S. 400 (2012)
    565 U.S. 400 (2012)................................................................................*passim*

*United States v. Montoya De Hernandez,*
    473 U.S. 531 (1985)......................................................................................10

*United States v. Niver,*
    689 F.2d 520 (5th Cir. 1982).......................................................................14

*United States v. Ramsey,*
    431 U.S. 606 (1977)........................................................................................9

*United States v. Seljan,*
    547 F.3d 993 (9th Cir. 2008).......................................................................10

*United States v. Smith*
    155 F.3d 1051 (9th Cir. 1998).....................................................................20

*Weeks v. United States,*
    232 U.S. 383 (1914)........................................................................................6

*Wong Sun v. United States,*
    371 U.S. 471 (1963)......................................................................................19

*Title 18, United States Code*
    §3117..............................................................................................................13

iv

**TO:   NICOLA T. HANNA, UNITED STATES ATTORNEY, AND TO
VICTORIA A. DEGTYAREVA, ASSISTANT UNITED STATES
ATTORNEY**

PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Jesus G. Bernal, United States District Judge, Defendants Slavco Ignjatov and Valentino Hristovski, through their respective above-listed counsel, will move and do hereby move this Honorable Court for entry of an order suppressing evidence improperly obtained by the government.

This request is made pursuant to the Fourth Amendment to the United States Constitution; subsequent case law; the accompanying declarations and exhibits; the pleadings and records on file in this matter; and upon such evidence and argument which may be presented prior to and at the hearing on this motion.

Dated: May 11, 2018                          Respectfully Submitted,

                                             /s/ *Steven F. Gruel*
                                             STEVEN GRUEL
                                             Attorney for Defendant
                                             SLAVCO IGNJATOV

                                             /s/ *Marilyn E. Bednarski*
                                             MARILYN E. BEDNARSKI
                                             Attorney for Defendant
                                             VALENTINO HRISTOVSKI

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## INTRODUCTION/SUMMARY OF ARGUMENT

This Motion challenges the warrantless placement of the Global Positioning System Device (hereinafter "GPS") on defendants' truck and the subsequent monitoring, collection and use of the location data derived from that device. When the United States Supreme Court decided *United States v. Jones* in 2012, it did so on a limited basis, holding that, under the facts of that case, the application of a GPS device was a trespass that necessarily violated the Fourth Amendment. The Court left open a more nuanced issue, however, which is whether, in the absence of a trespass, the actual monitoring of a vehicle using a GPS device or some other means of tracking would infringe upon an individual's reasonable expectation of privacy such that it, too, was constitutionally unreasonable.

In the present case, federal government agents attached a GPS tracker to a truck operated and occupied by Ignjatov and Hristovski. The device was installed while the truck was at the border between Canada and the United States. The first issue this Court must resolve is whether the application of the GPS device at the border implicates the same Fourth Amendment trespass concerns as the application of the GPS device in *Jones*. Defendants maintain that, even under the more permissible border search and extended border search doctrines, the attachment of a GPS device far exceeds the bounds of reasonableness. Because the government lacked a warrant, probable cause, or reasonable suspicion at the time the search occurred, the placement of the device was illegal and requires suppression of all geolocation data, all observations, and all evidence seized as a result of the subsequent detention.

Even if this Court determines that it was legal to secretly, and without a warrant, place a GPS device on the truck as part of a routine border search, it must still reckon with the tough questions left unanswered in *Jones*. Specifically, this Court must determine whether the ongoing surreptitious monitoring of a GPS device tracking the defendants over the course of 8 days and more than 4,000 miles infringes upon their reasonable expectation of privacy. The extent and nature of the digital tracking in this case demands finding a violation of the Fourth Amendment, especially since the government had ample time to seek a warrant but elected not to.

## II.
## SUMMARY OF FACTS

### A. The March, 2017 arrest of Karac and seizure of 194 kilograms of cocaine

In 2016, the FBI, working in concert with the Los Angeles Police Department ("LAPD"), began investigating what they believed to be an international drug trafficking organization, with leadership in Mexico (known as "the Boss"), that facilitated the movement of narcotics from the United States into Canada. In March, 2017, LAPD investigators observed a target of the investigation—who subsequently turned informant—known as "CHS1" travel to a known stash house, retrieve some boxes, return home, and leave again, this time carrying multiple, seemingly heavy duffel bags. CHS1 drove to a destination where s/he met with the driver of a large semi-truck displaying the logo of Bo-Mak Express Inc ("Bo-Mak"). They transferred ten duffel bags from CHS1's vehicle to the Bo-Mak truck.

After witnessing the transfer of the bags, LAPD officers tailed the Bo-Mak truck, eventually pulling it over for a vehicle code violation. A subsequent search

of the duffel bags yielded 194 kilograms of cocaine. Police arrested the driver of the truck, named Djorde Karac.

### B. <u>Investigators focus on Ignjatov and learn of possible "dry runs"</u>

During questioning, Karac informed the investigators that his brother-in-law, Slavco Ignjatov, was the owner of the Bo-Mak trucking company, and owned several trucks. Ignjatov had filed a missing persons report for Karac upon learning that the Canadian goods were not delivered. When he learned of Karac's arrest, he travelled to the Los Angeles area to retrieve the truck from an impound lot. Investigators also learned that years before in 2014 Ignjatov was considered a possible suspect in a drug trafficking investigation in New York.

Following the arrest of Karac, investigators learned from confidential informant sources that the organization was contemplating possible "dry runs" to determine whether the route was being monitored by police. Messages between the confidential informants and someone calling him/herself the "Boss" revealed that, by May of 2017, the organization successfully completed some of these proposed dry runs. Investigators also reviewed messages between the Boss and CHS1 and observed discussion related to the "brothers," which investigators believed to be a reference to Karac and Ignjatov. During these conversations, the Boss expressed concern about whether federal prosecutors were stepping in to take over the case against Karac. CHS1 died of a drug overdose in June 2017.

### C. <u>Government monitoring of Ignjatov and Hristovski</u>

On October 19, 2017, Special Agent Hannah Monroe, who led the investigation, received word from Customs and Border Patrol that the defendants, driving a Bo-Mak semi-truck, were scheduled to enter the United States at Port Huron, Michigan the next day. At the border the following day, Homeland Security

Investigations Border Enforcement Security Task Force ("HSI BEST") applied GPS trackers to the truck. The HSI agents also inspected the truck itself at the border "but found nothing unusual."

Over the next three days, the defendants drove across the continent, covering more than 2,000 miles on the way to Southern California. On the afternoon of October 22, 2017, an LAPD and FBI surveillance team, using the GPS data, located and observed the truck in San Bernardino, CA. Later that evening, the surveillance team observed the truck pull into a "Petro Center" in Ontario, CA, where it remained until the following day.

On October 23, 2017, at approximately 1:55 p.m., the surveillance team observed the truck in Mira Loma, CA, where it parked behind a Dodge sedan. Ignjatov and Hristovski got out of the truck and met with an unidentified man. Hristovski provided the man with "an unknown item resembling paper or money," and the unidentified man retrieved a small duffel bag from the trunk of the Dodge sedan and gave it to Hristovski.

The defendants then drove the truck to a nearby restaurant. Before the men could get out of the truck, LAPD detectives detained them. Ignjatov was driving at the time, and Hristovski was the passenger. The detectives located the duffel bag, opened it, and found 15 four-pound packages of C&H Sugar. The detectives found numerous cellphones inside the truck and two one-dollar bills that the detectives believed were used by the men as a means of identifying themselves to the unidentified man who provided the duffel bag. Additionally, the detectives located a password protected Blackberry in Hristovski's pants pocket that the detectives believed was used for transmitting encrypted messages; however, both defendants

denied any connection to the device. The agents seized the Blackberry and other phones and may have seized the bills and/ or other papers.[1]

The detectives did not arrest the defendants after the search. Instead, they left and headed back toward Port Huron, MI. On the night of October 28, 2017, as the defendants attempted to return to Canada, HSI Special Agent Greg Abair arrested them for conspiracy to traffic cocaine.

### III.

### THE GOVERNMENT'S WARRANTLESS APPLICATION OF A GPS DEVICE AND EXTENSIVE MONITORING OF DEFENDANTS' TRUCK WAS UNREASONABLE AND VIOLATED THEIR FOURTH AMENDMENT RIGHTS.

The Fourth Amendment to the United States Constitution preserves the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A vehicle is an "effect" within the meaning of the Fourth Amendment. *United States v. Chadwick,* 433 U.S. 1, 12 (1977). "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks v. United States*, 232 U.S. 383 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman v. United States*, 365 U.S. 505 (1961)." *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations in original). "Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the

---

[1] Discovery is continuing in this case. In addition, defendants' counsel intend to view all evidence seized in the case prior to the hearing on this motion.

connection with the unlawful search becomes 'so attenuated as to dissipate the taint.' *Id.* at 536-537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

The protections supplied by the Fourth Amendment also apply to aliens lawfully present in the United States. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (search of a "Mexican citizen holding a valid United States work permit" unsupported by probable cause near the border violated the Fourth Amendment); *see also Ma v. Ashcroft*, 257 F.3d 1095, 1119, fn. 23 (9th Cir. 2001).[2]

What follows below is a multi-step analysis. First, in order to assess this case, it is necessary to first consider whether, in the absence of a warrant, the application of the device was itself constituted an illegal search. Clearly, if the agents applied the device to a vehicle within the U.S. it would be illegal under *United States v. Jones*, 565 U.S. 400 (2012). The analysis is arguably more complicated because the trespass occurred at the border. Even under the case law defining the scope of the so-called "border search" and "extended border search" doctrines, however, the placement of GPS, in the absence of at least reasonable suspicion, is illegal.

If the Court agrees with the defendants that the application of the GPS device at the border was an unreasonable search within the meaning of the Fourth Amendment, then, as in *Jones*, it is unnecessary to grapple with the issues

---

[2] As demonstrated by the discovery in the case and the declarations filed contemporaneously with this motion, both defendants have standing to challenge the searches and seizures in this case through their joint ownership of the truck and trailer as well as their joint lawful possession of the truck during the eight-day period. They shared driving responsibilities and lived and worked in the truck throughout the time they were being monitored. *See* Attached Exhibit A (Declaration of Steve Gruel/Slavco Ignjatov) and Attached Exhibit B (Declaration of Valentino Hristovski).

surrounding the legality the subsequent monitoring of the GPS device. On the other hand, if this Court holds that the mere fact that the application of the GPS device occurred at the border distinguishes it from the search held to be illegal in *Jones*, then this Court must evaluate the legality of the subsequent *monitoring of the GPS data* to locate the defendants for surveillance purposes. Ultimately, the government must succeed on both fronts to overcome the defendants' challenge. If this Court concludes that either the application or the monitoring runs afoul of the Fourth Amendment, it must order the suppression of all evidence obtained as a result of the illegal searches.

**A.  <u>The application of the GPS device at the border constituted a search within the meaning for the Fourth Amendment for which a warrant was required.</u>**

The application of the GPS device to the defendants' truck should be looked at separately from the subsequent monitoring of the GPS data. Each is addressed in turn below; however, it's important to recognize that suppression is required if either the application or the monitoring violates the defendants' constitutional rights.

**1.  <u>Under *Jones*, the warrantless use of GPS devices is illegal when their application requires a trespass.</u>**

Within the U.S., the warrantless application of a GPS device on a person's car in his driveway was found illegal under *United States v. Jones*, 565 U.S. 400 (2012). Writing for the majority, Justice Scalia resorted to the concepts of property rights and trespass at the heart of the *Fourth Amendment* to hold that, the act of placing the device on the defendant's car was a "search" and, therefore, necessitated a warrant. Scalia distilled the Court's ruling as follows: "The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been

considered a 'search' within the meaning of the *Fourth Amendment* when it was adopted." *Id*. at 404.

It's not clear precisely under what circumstances the HSI BEST agents applied the GPS device. The facts surrounding the interception of the Bo-Mak truck at the border and the actual application of the GPS device remain obscure. And yet, the legality of the search and seizure issue could turn on the place and manner in which the government agents applied the device.[3]

### 2.   Even under the "border search" and "extended border search" exceptions to the warrant requirement, the application of the GPS device in this case was illegal.

The Fourth Amendment applies at the border, although "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). "That searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). "There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause." *Id*. at 619. "[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more

---

[3]   As noted above, discovery is continuing and defense counsel will seek to discover prior to the hearing information about the use of the GPS device and data, such as: whether the CBP reached into the truck to place the device or placed it on the outside of the vehicle; concerning the precision of the data obtained; concerning when and how the GPS data was transmitted to the agents; and, precisely how the data was used in the investigation.

favorably to the Government at the border." *United States v. Montoya De Hernandez*, 473 U.S. 531, 539-540 (1985) (internal citations omitted).

     a. <u>The application of a GPS device during a border search of the defendants' truck was unreasonable and not supported by reasonable suspicion or probable cause.</u>

The agents' application of a GPS device onto the defendants' truck at the border was a search within the meaning of the *Fourth Amendment*. *See Jones*, *supra*, 565 U.S. at 404 ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'").

Although border searches are a well-recognized exception to the warrant requirement, there must remain limitations on the extent to which the government may search those seeking admission into the country. *See e.g. United States v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) ("We decline the government's invitation to decide this case by holding that, at the border, anything goes.") In *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013), the Ninth Circuit, sitting *en banc*, sought to clarify the general requirement of reasonableness as it relates to border searches.

Returning by car from a trip to Mexico, the defendant in *Cotterman* attempted to cross the border in Arizona. *Id*. at 957. Due to his prior conviction and sex offender designation, Border Patrol agents, referred Cotterman to secondary inspection, where they examined his digital devices. *Id*. Advised that Cotterman might be engaging in child sex tourism, the agents were instructed to review his computers and cameras, but found them to be password protected. *Id*. at 958. After interviewing Cotterman and his wife, the agents allowed Cotterman to leave but kept his electronic devices. *Id*. The agents transported the devices to the ICE office

in Tuscon, AZ where they were forensically examined and child pornography was found. *Id*.

Applying the border search rubric, the Ninth Circuit concluded that while the initial [manual] search was justified, the subsequent forensic search was unreasonable and necessitated reasonable suspicion. *Id*. at 962-968. "Notwithstanding a traveler's diminished expectation of privacy at the border," the court reasoned, "the search is still measured against the *Fourth Amendment's* reasonableness requirement." *Id*. at 963. The Ninth Circuit further noted that the line dividing a routine border search from one that is constitutionally unreasonable is a blurry one: "The Court has never defined the precise dimensions of a reasonable border search, instead pointing to the necessity of a case-by-case basis. As we have emphasized, '[r]easonableness, when used in the context of a border search, is incapable of comprehensive definition or mechanical application.'" *Id*. (quoting *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982).)

The present case is similar inasmuch as the search here went beyond the ordinary and reasonable features of a border search. The defendants do not contest the right of the border agents to search their truck at the border, including the need to trespass against their property. The surreptitious application of a GPS device, however, is a more intrusive trespass that exceeds the usual bounds of such a search. While the defendants may reasonably expect an inspection at the border, they do not reasonably expect the placement of a device that monitors their every movement beyond the border, across the continent and for the duration of their eight-day journey. Like the forensic search in *Cotterman*, the placement of a GPS device reflects an unreasonable expansion of the border search protocol that must be supported, at a minimum, by reasonable suspicion.

At the point when the defendants entered the country, the government lacked reasonable suspicion of any potential crime. The information known to the government concerned a purported conspiracy to transport narcotics from the U.S. back into Canada. There was no evidence that the defendants or any Bo-Mak trucks were used to bring narcotics from Canada into the United States. Also, to the extent the agents had any suspicion at all, the agents' suspicions were limited to their belief that the suspects would be performing "dry runs"; there was no genuine belief that contraband was being transported at that time. The report prepared by HSI BEST describing the placement of the GPS devices makes it clear that the government anticipated that, if anything, this would be a dry run: "The devices enabled FBI LA to conduct surveillance of the truck during a dry run exercise where the targets picked up a duffel bag containing 60 lbs. of sugar from a male subject in Los Angeles."

Additionally, the government searched the truck upon entry into the country and found no contraband. The government was aware that the truck was destined for La Puente, CA and, therefore, essentially knew the route the defendants would be taking. Moreover, aside from his role as the owner of the Bo-Mak company, there was no reliable evidence that Ignjatov was in any way involved in trafficking narcotics, and it appears that Hristovski was totally unknown to the investigators at the time.

Significantly, there is no question that the government had ample time within which to seek a warrant for the placement of and use of a GPS device. Agent Monroe received notice that the Bo-Mak truck was scheduled to reach the border at least one day before the actual arrival. This afforded her enough time to obtain a warrant before applying the GPS device. Alternatively, the government had plenty of time to seek a warrant before it began monitoring the defendants'

movements. Any suspicion the government harbored at that time regarding possible criminality was tied to California, 2000 miles away, allowing the government two to three days beyond October 20 to seek a warrant. Therefore, assuming the government can justify the initial placement of the GPS device on the truck by invoking the border search doctrine, it cannot justify the extended warrantless monitoring of the defendants' movements over the course of eight days and 4,000 miles because the government could easily have requested a warrant. Furthermore, although the agents had sufficient time to make the request, it is doubtful that a federal magistrate even has the authority to sign off on such a warrant request. Under 18 U.S.C. §3117, a magistrate may "issue a warrant or other order for the installation of a mobile tracking device" but limits the use of the device to "within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction." *18 U.S.C. §3117(a)*. Assuming the agents installed the device before the defendants crossed the border, a federal magistrate lacks the authority to authorize the use of the device because it would necessarily be used outside the magistrate's district.

> b.   The application of the GPS device and the continuous monitoring of the defendants cannot be justified pursuant to the extended border search doctrine.

The Ninth Circuit has augmented its assessment of searches and seizures near the border by reference to the "extended border search doctrine." Pursuant to the doctrine, an extended border search requires a finding of reasonable suspicion. *See United States v. Guzman-Padilla*, 573 F.3d 865, 877 (9th Cir. 2009) ("The possible justifications for intrusion range from no suspicion if the seizure was incident to a "border search" or its functional equivalent, to 'reasonable suspicion' if the seizure was incident to an 'extended border search,' to probable cause if the seizure nonetheless constituted an 'arrest.'").

"Extended border searches are typically separated from the border by 'a greater spatial and temporal distance' from the actual border than searches at the functional equivalent of the border." *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007). "Because 'the delayed nature of an extended border search . . . necessarily entails a greater level of intrusion on legitimate expectations of privacy than an ordinary border search,' the government must justify an extended border search with reasonable suspicion that the search may uncover contraband or evidence of criminal activity." *Id.* (quoting *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422 (9th Cir. 1984).) The courts must also look to "whether the search . . . occurred at the last practicable opportunity before its passage over the international border." *Abbouchi*, *supra*, 502 F.3d at 855. Adopting the Fifth Circuit's approach, the Ninth Circuit recognized "'[t]he main difference between the functional equivalent of the border search and an extended border search is that the latter takes place after the first point in time when the entity might have been stopped within the country.'" *Guzman-Padilla*, *supra*, 573 F.3d at 878 (quoting *United States v. Niver*, 689 F.2d 520, 526 (5th Cir. 1982)).

Applying this approach to the present case commands the conclusion that, even if the initial application of the GPS device was outside the border and did not implicate *Fourth Amendment* concerns, the subsequent monitoring of Ignjatov's truck over eight days and more than 4,000 miles cannot be justified as an extended border search. The monitoring took place well beyond the "first point in time when the entity might have been stopped within the country."

As noted above, the agents lacked reasonable suspicion of criminal activity at the time the defendants entered the country. Even to the extent they suspected the defendants might engage in criminal activity in the future, that suspicion was pure speculation. Neither defendant participated in conversations with the

14

informants. There was a vague reference to brothers but not by name or any specificity.  There was no reference, vague or otherwise to Defendant Hristovski. Therefore, if the government were able to fashion a colorable argument that the GPS monitoring qualified as an "extended border search," it still cannot sustain its burden of demonstrating reasonable cause that the monitoring would generate evidence of criminal activity.

**B. <u>The defendants had a reasonable expectation of privacy in their location data, which was intercepted and monitored remotely for 8 days and over the course of more than 4,000 miles traveled.</u>**

When the Supreme Court decided *Jones*, it left open many questions, the answers to which are potentially necessary to the resolution of the present case. Scalia's opinion was narrow, focused exclusively upon the trespass that took place when the officers attached the GPS device to the defendant's car. In response to Justice Sotomayor's concurrence, Scalia acknowledged that although unreasonable trespass was the bedrock concern the *Fourth Amendment* was intended to prevent, modern Supreme Court jurisprudence contemplated an alternative framework based on an individual's reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 360 (1967). The *Jones* majority held that, "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Jones*, *supra*, 565 U.S. at 409 (emphasis in original).

As noted above, the border search and extended border search doctrines do not justify the application of the GPS device on the defendants' truck when they crossed into the United States. Beyond the initial application, however, there arises the problem of whether the agents were authorized to continuously monitor the defendants' movements across the country and back for over a week.

In *Jones*, responding to the concerns raised by Sotomayor's concurrence, Scalia acknowledged the difficulty in answering the question of whether the mere monitoring of a GPS device, or other similar locating device, would impermissibly infringe upon an individual's reasonable expectation of privacy. "It may be that achieving the same result through electronic means, without an accompanying trespass," Scalia opined, "is an unconstitutional invasion of privacy, but the present case does not require us to answer that question." *Id*. at 412. Acknowledging the concerns implicated by this difficult inquiry, Scalia continued:

> And answering it affirmatively leads us needlessly into additional thorny problems. The concurrence posits that "relatively short-term monitoring of a person's movements on public streets" is okay, but that "the use of longer term GPS monitoring in investigations *of most offenses* is no good. Post, at ___, 181 L. Ed. 2d, at 934 (emphasis added). That introduces yet another novelty into our jurisprudence. There is no precedent for the proposition that whether a search has occurred depends on the nature of the crime being investigated. And even accepting that novelty, it remains unexplained why a 4-week investigation is "surely" too long and why a drug-trafficking conspiracy involving substantial amounts of cash and narcotics is not an "extraordinary offens[e]" which may permit longer observation. See post, at ___ - ___, 181 L. Ed. 2d, at 934. What of a 2-day monitoring of a suspected purveyor of stolen electronics? Or of a 6-month monitoring of a suspected terrorist? We may have to grapple with these "vexing problems" in some future case where a classic trespassory search is not involved and resort must be had to Katz analysis; but there is no reason for rushing forward to resolve them here.

*Id*. at 412-413. If this Court concludes that the actual application of the GPS device was legal, then the present case is one of the "future cases" to which Scalia made reference because it requires an evaluation of whether the defendants had a reasonable expectation of privacy in the aggregated location data that the government obtained by monitoring the GPS signal.

In her concurring opinion, Justice Sotomayor expounded upon the myriad ways in which GPS tracking differs from ordinary surveillance and how those differences support recognizing an expectation of privacy. As Justice Sotomayor

pointed out, "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id*. at 415 (Sotomayor, J., concurring). Additionally, she noted that "because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: limited police resources and community hostility." *Id*. at 416 (Sotomayor, J., concurring) (internal quotation marks omitted).

In this case, there are several factors that militate in favor of concluding that the use of a GPS device under these circumstances infringed upon the defendants' reasonable expectation of privacy. These include the nature of the evidence of potential criminality, the duration of the surveillance, the range of monitored movement, the ability to obtain a warrant, and the nature of the object being monitored. All of these factors weigh in favor of finding a Fourth Amendment violation in the present case.

First, the investigators had no definite information regarding criminal activity by the defendants. The investigators based their suspicion on pure speculation, mostly due to Ignjatov's relationship to his brother-in-law Karac, who was arrested five months before trafficking narcotics. But nothing in the investigation leading up to the challenged search provided any reliable inculpatory evidence about either Ignjatov or Hristovski. The defendants had an undeniably innocent explanation for their journey; they planned and completed a delivery of goods to a destination in California. Additionally, the information that the government had regarding the alleged conspiracy was stale. The government's confidential informant died in June, and the last information that s/he provided to the government was in mid-May, some five months before the defendants' arrival

in the United States. Considering the vagueness of the suspicion, the staleness of the information, and the lack of any direct or inculpatory evidence, the government's actions were entirely speculative and cannot justify such an intrusion.

Second, the length of time that the government monitored the GPS data was far too long given the low level of suspicion. The government monitored the defendants for three days before witnessing any acts that could be characterized as potentially criminal. For three entire days, the government tracked the defendants' movements despite there being no indicators of criminality. The government observed the defendants living in the truck during the trip, which confirms the increased expectation of privacy they would have in the truck's movements.

Third, the fact that the government monitored the defendants' movements from Michigan to California before witnessing anything remotely suspicious also supports a finding that the search was unreasonable. Although it is understood that one retains a diminished expectation of privacy in his or her movements in public, no one anticipates that the government will monitor his or her movements 24 hours a day as he or she travels cross country and back. This is the sort of privacy interest that our society is prepared to acknowledge as legitimate.

Fourth, the government had ample opportunity to seek a warrant. Even if the government had the right to initially install the device, it could have easily sought judicial ratification of the ongoing monitoring. Agent Monroe indicated that she received notice on October 19, 2017 that the defendants were scheduled to pass through the border the following day. Bo-Mak submitted a manifest before traveling to the border, and government agents at the port alerted Agent Monroe a day before their arrival. This gave Agent Monroe time to seek a warrant. She never

sought a warrant, not on October 19 before the trip started, or at any time between the 20th and 28th of October.

Fifth, the nature of the defendants' use of the vehicle means that, for all intents and purposes, the government was effectively tracking their persons, as opposed to an object. The defendants were in the truck day and night. The use of a tracking device obliterated the privacy interests they reasonably had, or believed they had, during the trip.

## C. **Because the search and seizure of the GPS location data was illegal, all observations of the defendants, and any statements or evidence derived from the illegal search must be suppressed.**

The HSI BEST agents applied the GPS device on October 20, 2017, when the defendants first entered the United States. Despite having no definite knowledge of any past, present, or future criminal activity involving either defendant, the government monitored their movements as they travelled from Michigan to California and back. The alleged rendezvous with an unidentified individual in Mira Loma, CA from which the defendants supposedly received a duffel bag (later determined to contain only sugar) took place three days later, on October 23, 2017.

The guiding principle of the "fruit of the poisonous tree" doctrine "is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quoting John McArthur Maguire, Evidence of Guilt 221 (1959)). "The Court has fashioned three distinct exceptions to the 'fruits' exclusionary rule: (1) the 'independent source' exception; (2) the 'inevitable discovery' exception; and (3) the 'attenuated basis' exception."

*United States v. Smith* 155 F.3d 1051, 1060 (9th Cir. 1998). None of these exceptions apply in the present case.

Were it not for the use of the GPS tracking device, the investigators would have had no means by which to locate the defendants and observe the alleged transfer of the duffel bag that took place on October 23, 2017. It is implausible to believe that law enforcement could physically follow the defendants over their entire route from Michigan to California. Because the primary evidence obtained as a result of the surveillance was purely observational in nature, there was no independent source from which the government could have obtained that evidence. Additionally, even if the duffel bag full of sugar was located during a routine border search of the truck at the border as the defendants attempted to go back into Canada, the seizure of that duffel bag would have little evidentiary value divorced from the observation of the transaction. Moreover, it is probable that the defendants would have discarded the sugar prior to passing through the border. The duffel bag and sugar were not found in the truck when it was searched again on October 28 at the Canadian border. In sum, such evidence was not and would not have been inevitably discovered.

The attenuated basis exception is also unavailing. The constitutional violation in this case was ongoing; it was the constant monitoring of the defendants' location data and the use of that data to conduct surveillance. There was no intervening circumstance that served to break the causal chain between the constitutional violation and the evidence the government obtained as a result. The October 23 surveillance, the stop of the defendants and search of the truck at the restaurant parking lot were all fruits of the initial illegal search (i.e., the warrantless GPS monitoring). Consequently, all of this evidence, as well as any evidence gleaned from the subsequent October 28 arrest at the border, must be suppressed.

# VI.

## CONCLUSION

For the foregoing reasons, this Court should grant this motion and suppress:

● all GPS derived location data;

● all observations and evidence obtained as a result of the illegal use of the GPS monitoring device; such observations and evidence include, and are not limited to:

● those on October 23, 2017 when the agents pinpointed the location of the truck and observed the transfer of the small duffel containing packages of sugar;

● those later on October 23, 2017 when the agents pinpointed the location of the truck in the parking lot of the Cowboy Grill, where they searched the truck, found the duffel, and questioned the defendants, and seized multiple phones including a Blackberry;

● those on October 28, 2017 when agents pinpointed the location of the truck at the U.S./ Canadian Border, arrested the defendants, and seized multiple phones, paperwork and other items from the truck and their persons.

Dated: May 11, 2018                    Respectfully submitted,

                                       /s/ *Steven F. Gruel*
                                       STEVEN F. GRUEL
                                       Attorney for Defendant
                                       SLAVCO IGNJATOV

                                       /s/ *Marilyn E. Bednarski*
                                       MARILYN E. BEDNARSKI
                                       Attorney for Defendant
                                       VALENTINO HRISTOVSKI

# EXHIBIT A

STEVEN F. GRUEL (SBN 213148)

315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net

www.gruellaw.com

Attorney for Defendant SLAVCO IGNJATOV

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-17-0222-JSB |
| Plaintiff, | |
| v. | STEVEN F. GRUEL'S DECLARATION IN SUPPORT OF JOINT MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI; |
| SLAVCO IGNJATOV, et al., | |
| Defendants. | |
| | Honorable Jesus G. Bernal |

I, STEVEN F. GRUEL, under penalty of perjury hereby declare as follows:

1.      I am attorney in good standing with the California State Bar. I am the attorney of record for defendant Slavco Ignjatov in the above-captioned case. This declaration is submitted in support of the defendants' motion to

1

suppress evidence filed contemporaneously herewith.  I hereby state and declare as follows:

2.       I have reviewed the discovery produced by the government in this case. The facts stated in the accompanying JOINT NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI are derived from my review of the government's discovery.

3.       Attached hereto is the Declaration of my client Slavco Ignjatov.  I went over the contents of the declaration with him.  While he agrees that the contents of his declaration are true, I have yet to obtain his signature for the declaration because he is in custody in Los Angeles, and my office is in San Francisco. Slavco Ignjatov's signature on his declaration will be filed immediately after I obtain it from him.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May 2018, in San Francisco, California.

DATED:   May 11, 2018


                                        /s/  Steven Gruel____
                                        STEVEN F. GRUEL

STEVEN F. GRUEL (SBN 213148)

315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net

www.gruellaw.com

Attorney for Defendant SLAVCO IGNJATOV

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION - RIVERSIDE

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SLAVCO IGNJATOV, et al.,<br><br>Defendants. | No. CR-17-0222-JSB<br><br>DEFENDANT IGNJATOV'S DECLARATION IN SUPPORT OF MOTON TO SUPPRESS EVIDENCE<br><br>Honorable Jesus G. Bernal |

I, SLAVCO IGNJATOV, under penalty of perjury hereby declare as follows:

1.    I am a defendant in the above-captioned case. This declaration is submitted for the purpose of establishing standing in support of the motion to

1

suppress evidence filed contemporaneously.  I hereby state and declare as follows:

2.  I am submitting this declaration to establish my standing to challenge the search pursuant to Local Rule 12-1.1 and in support of the Motion to suppress the search. This declaration is provided pursuant to the protections and limitations of *Simmons v. United States*, 390 U.S. 377 (1968).

3.  I was lawfully in possession of the truck and attached refrigerated trailer searched on October 23, 2017 in this case. I also was one of two drivers of that truck pulling that refrigerated trailer between October 20, 2017 and October 28, 2017.  During this period, I was either actually driving the truck or a passenger in the truck.

4.  I did not know of or consent to the placement of a GPS device on the truck or trailer used to track my whereabouts from October 20, 2017 to October 28, 2017.

5.  I was in lawful possession of the truck, trailer, and container during the entire period between October 19, 2017 and October 28, 2017 and have standing to challenge the search of the truck, trailer, and container.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __ day of May 2018, in Los Angeles, California.

DATED:

_____
SLAVCO IGNJATOV
Defendant

# EXHIBIT B

## DECLARATION OF VALENTINO HRISTOVSKI

I, Valentino Hristovski, hereby state and declare as follows:

1.      I am a defendant in the case of *United States v. Slavco Ignjatov, et. al,*. CR ED 17-222-JGB.  I am submitting this declaration to establish my standing to challenge the search pursuant to Local Rule 12-1.1 and in support of the Motion to suppress the search. This declaration is provided pursuant to the protections and limitations of *Simmons v. United States,* 390 U.S. 377 (1968).

2.      I was lawfully in possession of the truck and attached refrigerated trailer searched on October 23, 2017 in this case. I am the owner of the truck. I also was one of two drivers of that truck pulling that refrigerated trailer between October 20, 2017 and October 28, 2017.  During this period, I was either actually driving the truck or a passenger in the truck.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10 day of May 2018, in Los Angeles, California.

By _____

VALENTINO HRISTOVSKI
Defendant

Dm151349