NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
VICTORIA A. DEGTYAREVA (Cal. Bar No. 284199)
Assistant United States Attorney
OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7635
     Facsimile: (213) 894-0142
     E-mail:    Victoria.Degtyareva@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. ED CR 17-222(A)-JGB |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS SLAVCO IGNJATOV AND VALENTINO HRISTOVSKI'S JOINT MOTION TO SUPPRESS EVIDENCE |
| v. | |
| SLAVCO IGNJATOV, et al., | Hearing Date: June 11, 2018 |
| Defendants. | Hearing Time: 2:00 p.m. Location:    Courtroom of the Hon. Jesus G. Bernal |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Victoria A.
Degtyareva, hereby files its Opposition to the Joint Motion to
Suppress Evidence filed by defendants SLAVCO IGNJATOV and VALENTINO
HRISTOVSKI.

//

//

//

//

This Opposition is based upon the attached memorandum of points and authorities, the Declarations of Hannah Monroe and Asatur Mkrtchyan filed herewith, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 21, 2018                 Respectfully submitted,

                                    NICOLA T. HANNA
                                    United States Attorney

                                    LAWRENCE S. MIDDLETON
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    _____/s/_____
                                    VICTORIA A. DEGTYAREVA
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.    INTRODUCTION.................................................................1

II.   STATEMENT OF FACTS..........................................................4

      A.    Seizure of 194 Kilograms of Cocaine...................................4

      B.    Prior Investigation of IGNJATOV......................................5

      C.    Discussions About KARAC's Case.......................................6

      D.    Discussions About Dry Runs...........................................6

      A.    Interception of IGNJATOV and HRISTOVSKI Conducting Dry
            Run..................................................................7

III.  ARGUMENT...................................................................10

      A.    The Evidence is Admissible Under the Attenuation and
            Inevitable Discovery Exceptions to the Exclusionary
            Rule................................................................10

            1.    The Evidence is Admissible Because it was Too
                  Attenuated From the Use of the Tracker Devices......10

            2.    The Evidence is Admissible Because it Would Have
                  Been Inevitably Discovered..........................13

      B.    The Installation and Use of the Tracking Devices Was
            Lawful and Supported by Probable Cause..................15

            1.    The Installation of the Tracking Devices at the
                  Border Was Permissible Even Without
                  Individualized Suspicion............................15

            2.    Even if Individualized Suspicion Were Required,
                  Investigators Had Probable Cause to Believe
                  Defendants Were Engaged in Drug Exportation........17

            3.    The Short-Term Monitoring of the Tracking Devices
                  Was Reasonable and Permissible Under *Jones*..........22

      C.    Even if the Installation and Use of the Tracking
            Devices was Unlawful, the Evidence is Still Admissible
            Under the Good Faith Exception to the Exclusionary
            Rule................................................................24

IV.   CONCLUSION.................................................................25

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**CASES**

Almeida Sanchez v. United States,
    413 U.S. 266 (1973).......................................16, 17

Davis v. United States,
    564 U.S. 229 (2011).............................................25

Hudson v. Michigan,
    547 U.S. 586 (2006).......................................10, 11

New York v. Class,
    475 U.S. 106 (1986).............................................24

Segura v. United States,
    468 U.S. 796 (1984).............................................11

United States v. Chadwick,
    433 U.S. 1 (1977)...............................................24

United States v. Cotterman,
    709 F.3d 952 (9th Cir. 2013)...................................22

United States v. Dozier,
    844 F.2d 701 (9th Cir. 1988)...................................21

United States v. Flores-Montano,
    541 U.S. 149 (2004).......................................15, 16

United States v. Greany,
    929 F.2d 523 (9th Cir. 1991)...................................21

United States v. Hernandez-Escarsega,
    886 F.2d 1560 (9th Cir. 1989)..................................21

United States v. Howell,
    231 F.3d 615 (9th Cir. 2000)....................................2

United States v. Jones,
    565 U.S. 400 (2012)........................................passim

United States v. Knotts,
    460 U.S. 276 (1983).............................................23

United States v. Kolsuz,
    -- F. 3d --, 2018 WL 2122085 (4th Cir. May 9, 2018).......20, 25

United States v. Luna-Santillanes,
    554 Fed. App'x 402 (6th Cir. 2014)............................14

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Martin,
     712 F.3d 1080 (7th Cir. 2013)...............................11, 12

United States v. McLayea,
     No. 1:12-cr-120-WTL-DML, 2014 WL 931882 (S.D. Ind. March 7,
     2014)........................................................12

United States v. Montoya de Hernandez,
     473 U.S. 531 (1985)..................................15, 22, 25

United States v. Powell,
     943 F. Supp. 2d 759 (E.D. Mich. 2013)........................12

United States v. Ramos,
     190 F. Supp. 3d 992 (S.D. Cal. 2016).........................20

United States v. Ramsey,
     431 U.S. 606 (1977)..........................................15

United States v. Rowell,
     903 F.2d 899 (2nd Cir. 1990).................................21

United States v. Sutton,
     No. 1:15-CR-42-TLS, 2017 WL 2126800 (N.D. Ind. May 16,
     2017)........................................................13

United States v. Verdugo-Urquidez,
     494 U.S. 259 (1990)..........................................10

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3   Defendants SLAVCO IGNJATOV ("IGNJATOV") and VALENTINO HRISTOVSKI

4 ("HRISTOVSKI") ("defendants") are charged with conspiracy to

5 distribute and to possess with intent to distribute cocaine, in

6 violation of 21 U.S.C. §§ 846, 841(a), (b)(1)(A)(ii)(II).

7   Defendants are alleged to be part of a drug trafficking

8 organization ("DTO") that traffics cocaine from Southern California

9 to other states and to Canada.  As part of the alleged conspiracy,

10 defendants entered the United from Canada on October 20, 2017 to

11 conduct a "dry run" (i.e., the transportation of legal substances in

12 a manner consistent with drug shipments to determine whether a route

13 is safe for the transportation of drugs).  Defendants' dry run

14 mirrored the route previously used by co-defendant DJORDJE KARAC

15 ("KARAC") to transport approximately 194 kilograms of cocaine in

16 March 2017.  On October 23, 2017, while conducting physical

17 surveillance of defendants' semi-truck, investigators saw defendants

18 receive a duffle bag from an unknown man in nearly the same location

19 where KARAC had received duffle bags containing cocaine from a co-

20 conspirator in March.  Investigators then followed defendants as they

21 drove to the same parking lot where KARAC had driven immediately

22 after the March cocaine exchange.  Investigators detained defendants

23 at this location and, upon searching their semi-truck, found that the

24 duffle bag contained 15 four-pound packages of sugar (i.e., a sham

25 substance consistent with a dry run).

26   Defendants now seek an order suppressing investigators'

27 observations of defendants during the physical surveillance, as well

28

as all evidence seized from defendants thereafter,[1] on the grounds that this evidence was derived from the warrantless use of GPS tracking devices, which were installed on defendants' semi-truck and trailer at the United States-Canada border.  Defendants' motion should be denied without an evidentiary hearing.[2]

As a preliminary matter, the evidence sought to be suppressed was obtained based on the physical surveillance conducted by law enforcement officers, not on location information from the GPS trackers.  Courts have repeatedly held that, under such circumstances, officers' observations and subsequent searches cannot be suppressed even if the physical surveillance was initiated with the aid of a warrantless GPS tracker.  Additionally, investigators would have been able to locate the semi-truck without the trackers because they knew, independently of the trackers, when defendants entered the United States and that defendants would follow the route previously taken by KARAC.  Thus, regardless of whether the installation and use of the tracking devices were lawful, the exclusionary rule does not apply because (1) the officers' observations of the suspected drug transaction and the subsequent search of the vehicle were so attenuated from the use of the tracking devices and (2) the evidence would have been inevitably discovered.

---

[1] The only evidence seized from defendants that the government intends to introduce at trial was seized during the October 23, 2017 search of their semi-truck.

[2] As stated in the declaration of Steven F. Gruel, the statement of facts in defendants' motion is based on the discovery provided by the government.  The declarations submitted by defendants do not dispute any of those facts.  Because there are no disputed facts, no evidentiary hearing is necessary.  See United States v. Howell, 231 F.3d 615, 620-21 (9th Cir. 2000) (not abuse of discretion for district court to deny motion to suppress without evidentiary hearing where facts were not in dispute).

In any event, the installation and use of the GPS tracking devices in this case was lawful and permissible under <u>United States v. Jones</u>, 565 U.S. 400 (2012), because there was no trespass and the monitoring lasted for less than 48 hours.[3]  First, the installation of the GPS tracking devices at the border was justified under the "border exception" to the Fourth Amendment's warrant requirement, which permits warrantless and suspicionless searches of vehicles at the border, and, thus, there was no illegal trespass.  Second, the monitoring of the GPS tracking devices beyond the border was reasonable because it lasted for a relatively short period of time.  Moreover, even if the Court finds that some individualized suspicion were required to install and use the GPS trackers, the agents in this case had reasonable suspicion – and, indeed, probable cause - that defendants were entering the United States to further the goals of the drug trafficking conspiracy.

Finally, in the alternative, the challenged evidence is admissible under the good-faith exception to the exclusionary rule because the investigators relied on binding precedent regarding the border search exception.

---

[3] Defendants contend that they were tracked for 8 days because the tracker was installed on October 20, 2017 and removed on October 28, 2017.  (Mot. at 3, 14, 15.)  However, the observations and evidence that defendants seek to suppress are from October 22 and October 23, 2017; the government does not intend to introduce at trial anything seized during defendants' arrest on October 28.  Once officers began conducting physical surveillance of the truck in the afternoon of October 22, they maintained continuous physical surveillance on defendants until they stopped defendants on October 23, 2017 based on their observations during that surveillance.  (Declaration of Asatur Mkrtchyan ("Mkrtchyan Decl.") ¶ 7.)  Thus, the relevant time period of the trackers' use is from October 20, 2017 at approximately 7 p.m. (PST) (when they were installed) until October 22, 2017 at approximately 4:45 p.m. (PST) (when physical surveillance began).  (Declaration of Hannah Monroe ("Monroe Decl.") ¶¶ 15-16.)

3

## II.   STATEMENT OF FACTS

### A.   Seizure of 194 Kilograms of Cocaine

Since early 2016, the Los Angeles Police Department ("LAPD") and the Federal Bureau of Investigation ("FBI") had been investigating a drug trafficking organization in the Los Angeles area that traffics cocaine from Southern California to Chicago, from where it is eventually sent to Toronto, Canada. (Complaint Affidavit ("Compl. Aff.") ¶ 10, Exhibit A to the Monroe Decl.) CHS1 was initially a target of this investigation. (Compl. Aff. ¶ 12.)

On March 16, 2017, an LAPD surveillance team conducted surveillance on CHS1. (Compl. Aff. ¶¶ 13-15.) Investigators saw CHS1 drive to a location in Mira Loma, California. (Compl. Aff. ¶ 14.) S/he parked in front of a white semi-truck, bearing an Ontario, Canada license plate 3636PL, and trailer plate K7416V. Ibid.; Monroe Decl. ¶ 5.) The semi-truck had the logo Bo-Mak Express Inc. ("BO-MAK") on the door. (Compl. Aff. ¶ 14.) CHS1 met with the driver of the BO-MAK semi-truck, who was later identified as co-defendant KARAC. (Ibid.) CHS1 removed ten duffle bags from his/her vehicle and handed them to KARAC, who loaded them into the BO-MAK semi-truck. (Ibid.) KARAC then drove the BO-MAK semi-truck to the parking lot of "Cowboy Burgers and BBQ" in Fontana, California, where he stayed for nearly five hours. (Compl. Aff. ¶ 15.) That evening, KARAC left the restaurant parking lot in the semi-truck and a California Highway Patrol ("CHP") officer conducted a traffic stop of the truck for a vehicle code violation. (Ibid.) The CHP officer searched the truck and found the ten duffle bags that CHS1 had given to KARAC inside the cab of the truck. (Ibid.) The duffle bags contained a total of approximately 194 kilograms of cocaine. (Ibid.)

4

Investigators also seized an encrypted Blackberry device from KARAC. (Compl. Aff. ¶ 37.) KARAC gave consent to search the device and provided the password to gain access. (_Ibid._) Upon opening the device, investigators saw a message sent from an unknown subject to KARAC that read "194," which corresponds to the number of kilograms of cocaine found in the truck KARAC was driving. (_Ibid._)

In a post-arrest interview, after waiving his _Miranda_ rights, KARAC stated he had transported drugs from Los Angeles to Chicago previously. (Monroe Decl. ¶ 6.) He also said that an individual named "Slavco" was the boss of BO-MAK and owned several trucks and trailers. (Compl. Aff. ¶ 16.) Records from the Canadian Ministry of Transportation confirmed that IGNJATOV (whose first name is Slavco) was the owner of BO-MAK and that KARAC and HRISTOVSKI worked as drivers for the company. (Compl. Aff. ¶ 6.)

After CHS1 agreed to cooperate with law enforcement, s/he confirmed the DTO had been shipping drugs from Southern California to Canada, via Chicago, using semi-trucks. (Monroe Decl. ¶ 8.)

**B.   Prior Investigation of IGNJATOV**

The day of the cocaine seizure, FBI Special Agent ("SA") Hannah Monroe conducted an FBI records check, which revealed a 2014 investigation, during which IGNJATOV was suspected of using a BO-MAK truck to attempt to transport cocaine from New York to Canada. (Compl. Aff. ¶ 20.) SA Monroe learned that, during the 2014 investigation, IGNJATOV was captured on consensually recorded phone calls with a confidential source coordinating the pick-up of the cocaine, and a truck registered to his company, BO-MAK, was later seen by law enforcement officers near the scene of the staged cocaine hand-off. (Compl. Aff. ¶ 20, fn. 2.)

5

**C.   Discussions About Dry Runs**

After the March cocaine seizure, in an effort to determine whether law enforcement had uncovered the DTO's methods for transporting cocaine, members of the DTO discussed and executed a plan to conduct dry runs.  (Compl. Aff. ¶¶ 21-25.)  For example, on March 19, 2017, during a consensually recorded conversation just three days after the seizure, CHS1 (before CHS1 began cooperating with law enforcement) discussed with a confidential source how a test load should be conducted before shipping any additional cocaine, stating: "What we need to do is do a dry run.  And I want to put like a bunch of flour in it or something."  (Compl. Aff. ¶ 21.)  On April 21, 2017, CHS1 and the suspected leader of the DTO, who is known as "Boss" ("BOSS"), further discussed conducting dry runs through messages over an encrypted device.  (Compl. Aff. ¶ 25.)  During the conversation, BOSS told CHS1 "to start sending dry runs let's have doing dry runs for a month before we make them live."  (Compl. Aff. ¶ 25(b).)  Over the following few weeks, CHS1 updated BOSS via messages that several dry runs had been completed successfully. (Compl. Aff. ¶ 25(c)-(d).)

**D.   Discussions About KARAC's Case**

After CHS1 began cooperating with law enforcement, s/he continued to exchange messages with BOSS at agents' direction. (Monroe Decl. ¶ 10.)  In several of these messages, BOSS made clear to CHS1 that he was closely monitoring the pending state charges against KARAC to determine whether the federal government intended to prosecute the March cocaine seizure.  For example, in a message on May 15, 2017 - which was sent contemporaneously with a picture of the "Probable Cause Declaration" filed for KARAC in state court - BOSS

6

told CHS1, "as for brothers all quiet waiting on next court date to see what happens if feds take it over or not …" (Compl. Aff. ¶ 26(a); Monroe Decl. ¶ 10.)  Then, on May 20, 2017, BOSS sent CHS1 another message stating, "spoke to buddys brother he wants to get back to work but I rather wait to see what happens next court date if the feds take it over or not …" (Monroe Decl. ¶ 10.)  Notably, IGNJATOV reported in a missing person's report that he was KARAC's brother-in-law. (Compl. Aff. ¶ 18.)  Accordingly, SA Monroe believed that "brothers" referred to KARAC and IGNJATOV, "buddys brother" to IGNJATOV, and "work" to transporting cocaine. (Ibid.)

**E.    Interception of IGNJATOV and HRISTOVSKI Conducting Dry Run**

On October 19, 2017, Customs and Border Patrol ("CBP") notified SA Monroe that defendants were entering the United States from Canada through Port Huron, Michigan with a BO-MAK semi-truck, bearing Ontario, Canada plate 4385PS and trailer plate K7416V – the same trailer KARAC used when he was transporting cocaine in March. (Compl. Aff. ¶ 28; Monroe Decl. ¶ 11.)  According to a travel manifest submitted by BO-MAK, the truck was traveling to a town about 45 minutes away from where KARAC had previously picked up cocaine from CHS1 in March. (Compl. Aff. ¶ 28; Monroe Decl. ¶ 11.)  This was the first trip, of which investigators were aware, to Southern California made by any truck associated with BO-MAK since the seizure of 194 kilograms of cocaine in March 2017. (Compl. Aff. ¶ 28.)

Defendants entered the United States from Canada the following day, on October 20, 2017. (Compl. Aff. ¶ 29.)  Based on her belief that border agents were authorized to install warrantless trackers on vehicles at the border, SA Monroe asked border agents in Port Huron to install GPS trackers upon the BO-MAK truck's arrival at the United

States-Canada border.  (Monroe Decl. ¶ 14.)  While at the border, a
CBP agent installed two tracking devices on the BO-MAK semi-truck and
trailer at approximately 7 p.m. (PST).  (Monroe Decl. ¶ 15.)

Investigators tracked those devices for less than 48 hours
until, on October 22, 2017, at approximately 4:45 p.m., an LAPD and
FBI surveillance team began conducting physical surveillance on the
BO-MAK semi-truck driven by defendants.  (Compl. Aff. ¶ 30.)  From
this time until defendants were stopped by law enforcement more than
21 hours later, investigators maintained continuous physical
surveillance of the semi-truck.  (Mkrtchyan Decl. ¶ 7.)

On October 23, 2017, surveillance units followed the BO-MAK
semi-truck from Ontario, California until it stopped in Mira Loma,
California.  (Mkrtchyan Decl. ¶ 8.)  At about 1:55 p.m., the truck
made a right turn on Dulles Drive, where it parked behind a car with
paper plates, which was driven by an unknown man.  (Ibid.)  The
location where defendants stopped was less than a mile from where
KARAC met CHS1 for the cocaine hand-off on March 16, 2017.  (Ibid.)
Defendants got out of the BO-MAK truck and met with the unknown man.
(Ibid.)  The unknown man took a small duffle bag from the trunk of
his car and handed it to HRISTOVSKI.  (Mkrtchyan Decl. ¶ 9.)
Defendants walked back to the BO-MAK truck with the duffle bag and
drove away.  (Ibid.)  The BO-MAK truck then drove to "Cowboy Burger
and BBQ" in Fontana, California – the same spot where KARAC had
driven after receiving cocaine from CHS1.  (Ibid.)

The route taken by IGNJATOV and HRISTOVSKI was almost identical
to the route previously taken by KARAC when he picked up the 194
kilograms of cocaine from CHS1 on March 16, 2017, and both hand-offs
occurred at around the same time of day.  (Compl. Aff. ¶ 32.)  On

8

both occasions, the BO-MAK trucks entered into the San Bernardino

area, stopped near Etiwanda St. and Philadelphia Drive to conduct a

hand-off of duffle bags, and then parked at Cowboy Burgers and BBQ

immediately after the exchange.  (<u>Ibid.</u>)

**F.    Search of the BO-MAK Semi-Truck**

At approximately 2 p.m. that same day, as defendants were

preparing to exit the semi-truck, the investigators who had been

conducting continuous surveillance detained them.  (Mkrtchyan Decl.

¶ 10.)   IGNJATOV consented to a search of the truck.  (Mkrtchyan

Decl. ¶ 11.)   During the search, investigators found the small duffle

bag that the unknown man had given to HRISTOVSKI.  (<u>Ibid.</u>)   Inside

the duffle bag were 15 four-pound packages of sugar.  (<u>Ibid.</u>)   A

trained drug-detection dog alerted to the presence of the odor of

narcotics on the duffle bag.  (Mkrtchyan Decl. ¶ 12.)   Investigators

also found two one-dollar bills, which the DTO often uses as a method

of identification when conducting drug transactions; and numerous

cell phones, including a Moto phone that appeared to have just been

purchased.  (Mkrtchyan Decl. ¶ 11.)   The Moto phone contained only

one text message sent at 12:34 p.m. on October 23, 2017 (the day of

the dry run), which read: "3055 Dulles Dr, Mira Loma 91752."  (Monroe

Decl. ¶ 17.)   This was the same address where the exchange between

defendants and the unknown man took place.  (<u>Ibid.</u>)

During an officer safety pat down search of HRISTOVSKI,

investigators found an encrypted Blackberry device in HRISTOVSKI's

pants pocket, which resembled the encrypted Blackberry devices that

other members of the DTO – such as KARAC and CHS1 - used to securely

communicate.  (Mkrtchyan Decl. ¶ 13.)   HRISTOVSKI said he did not

know to whom the Blackberry belonged, despite it being found in his

9

1  pocket, and IGNJATOV also denied that the Blackberry was his.

2  (Ibid.)  Defendants were then released.  (Monroe Decl. ¶ 16.)

3      Defendants were later arrested on October 28, 2017, when they

4  attempted to cross the border back into Canada at Port Huron,

5  Michigan.  (Compl. Aff. ¶¶ 30-40.)

6  **III. ARGUMENT**

7      **A.   The Evidence is Admissible Under the Attenuation and**
         **Inevitable Discovery Exceptions to the Exclusionary Rule**
8

9      Regardless of whether the installation and use of the tracking

10  devices was lawful, the exclusionary rule does not apply to the

11  evidence at issue because (1) the evidence was obtained based on

12  investigators' observations during physical surveillance, not on GPS

13  data, and thus it is too attenuated from the use of the trackers,

14  even though surveillance was initiated with the aid of the trackers;

15  and (2) the evidence would have been inevitably discovered.[4]

16          1.   The Evidence is Admissible Because it was Too
                 Attenuated From the Use of the Tracker Devices
17

18      The fact that an illegal search "was a 'but for' cause of

19  obtaining evidence .... is only a necessary, not a sufficient,

20  condition for suppression."  Hudson v. Michigan, 547 U.S. 586, 592

21  (2006).  The exclusionary rule does not apply where "the link between

22  the illegality and th[e] evidence was sufficiently attenuated to

23  _____

24      [4] Defendants also argue that "[a]ssuming the agents installed
    the device before the defendants crossed the border, a federal
25  magistrate lacks the authority to authorize the use of the device
    because it would necessarily be used outside the magistrate's
26  district."  (Mot. at 13.)  But the undisputed evidence is that the
    devices were installed at the border inspection point.  (Monroe Decl.
27  ¶ 15.)  Moreover, if the devices were installed outside United States
    jurisdiction, the Fourth Amendment would not apply to their
28  installation because defendants were not U.S. citizens or residents.
    See United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75 (1990).

1   dissipate the taint," Segura v. United States, 468 U.S. 796, 815

2   (1984), including "when the causal connection is remote" or when "the

3   interest protected by the constitutional guarantee that has been

4   violated would not be served by suppression of the evidence

5   obtained." Hudson, 547 U.S. at 592-93.

6       After Jones, courts have uniformly found that, when sufficient

7   attenuation exists, officers' observations during physical

8   surveillance and subsequent searches are not subject to the

9   exclusionary rule even though the surveillance was initiated using a

10  warrantless GPS tracker. For example, in United States v. Martin,

11  712 F.3d 1080 (7th Cir. 2013), police officers received a tip that

12  the defendant had recently robbed a bank in Iowa. They attached a

13  warrantless GPS device to his car and then tracked him to Illinois

14  using the GPS device. In Illinois, with the aid of the GPS data, a

15  local officer stopped and searched the car, finding drugs and a

16  revolver. Id. at 1081. The Seventh Circuit held that, even if the

17  warrantless installation of the device on defendant's vehicle was

18  unlawful under Jones, it did not require suppression of the evidence

19  seized during the subsequent search of his car because "[t]he

20  evidence he seeks to suppress had little to do with the fact that a

21  GPS device had been used at all ... it was significantly 'attenuated'

22  from the improper installation of the device." Id. at 1082. The

23  court found that "[t]he GPS data here appears simply to have aided

24  law enforcement officials in tracking down Martin," and noted that

25  "[t]his is quite different from the situation in Jones, where the GPS

26  data was used to establish a necessary link between the defendant and

27  a cocaine stash house[.]" Id.

28

11

Other courts have reached similar conclusions. See, e.g., United States v. McLayea, No. 1:12-cr-120-WTL-DML, 2014 WL 931882, at *4 (S.D. Ind. March 7, 2014) (unpublished) (denying suppression motion where officer obtained defendant's location via warrantless GPS tracker, began physical surveillance, observed a suspected drug transaction, and then requested a traffic stop); United States v. Powell, 943 F. Supp. 2d 759, 788-89 (E.D. Mich. 2013) ("[t]he traffic stop and search are sufficiently attenuated from use of the GPS tracker to preclude application of the exclusionary rule" where officers searched defendant's car after locating the car through the use of a warrantless GPS tracker on a co-defendant's car).

Like in Martin, investigators here had reasonable suspicion and probable cause that IGNJATOV and HRISTOVSKI were entering the United States to pick up cocaine for eventual transportation to Canada and had reason to believe defendants would use the same route KARAC previously used to transport cocaine in March. (See infra. pp. 17-21). The GPS data simply aided officers in initiating physical surveillance of defendants' truck in San Bernardino. Once they began surveillance, officers maintained continuous surveillance for over 20 hours, never losing sight of the truck, until they saw a suspected drug transaction. (Mkrtchyan Decl. ¶ 7.) The subsequent search of the BO-MAK semi-truck was based on investigators' observations during their lengthy physical surveillance, not on GPS data. See McLayea, 2014 WL 931882, at *3 ("The only connection between the use of the GPS device and the later traffic stop and search of McLayea's van is that Detective Wolfe used the GPS to locate McLayea on January 25, 2011. Once he did, physical surveillance was initiated. In other words, like was the case in Martin, the 'necessary link' in this case

is missing."); see also United States v. Sutton, No. 1:15-CR-42-TLS, 2017 WL 2126800, at *5-6 (N.D. Ind. May 16, 2017) (denying motion to suppress evidence seized during search of vehicle where warrantless GPS units installed on the vehicle "were intended to be a secondary measure to the ground and air surveillance that occurred" and "this surveillance maintained constant watch on the [vehicle]").

Thus, because the evidence sought to be suppressed is too attenuated from the use of the GPS trackers, the exclusionary rule does not apply.  This is especially true because, to the extent the Court finds that the installation or use of the trackers was unlawful, the investigators' actions were based on their good-faith belief that they were acting in accordance with the border search exception.  (Monroe Decl. ¶ 14.)  Because "the attenuation doctrine ... favor[s] exclusion only when the police misconduct is most in need of deterrence – that is, when it is purposeful or flagrant," suppression is not warranted here.  Strieff, 136 S. Ct. at 2063.

> ###### 2.   The Evidence is Admissible Because it Would Have Been Inevitably Discovered

The exclusionary rule is also inapplicable in this case under the inevitable discovery doctrine.  "[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."  Strieff, 136 S.Ct. at 2061.  In this case, SA Monroe learned from CBP (1) that IGNJATOV and HRISTOVSKI entered the United States on October 20, 2017, (2) that they were heading to a town about 45 minutes away from where KARAC had picked up cocaine in March, and (3) the license plate numbers of their semi-truck and trailer (which was the very same trailer KARAC had used in March).  (Monroe Decl. ¶ 11.)

13

1    Additionally, based on the messages between BOSS and CHS1 discussing

2    conducting several successful dry runs after the March seizure to

3    determine if the route was safe for cocaine transportation, SA Monroe

4    believed that IGNJATOV and HRISTOVSKI would follow the same route

5    that KARAC took in March 2017; and they did, in fact, follow the same

6    route.  (Monroe Decl. ¶ 13; Compl. Aff. ¶ 32.)  Accordingly, even

7    without the trackers, investigators would have been able to locate

8    the BO-MAK truck in Southern California (for example, by setting up

9    surveillance units along the route KARAC had used in March, using

10   aerial surveillance, or requesting local patrol officers to be on

11   lookout for the BO-MAK truck), conduct physical surveillance, observe

12   the suspected drug transaction, and then search the truck.[5]  For this

13   additional reason, the exclusionary rule does not apply.  See, e.g.,

14   United States v. Luna-Santillanes, 554 Fed. App'x 402, 406 (6th Cir.

15   2014) (unpublished) (affirming denial of suppression motion under

16   inevitable discovery doctrine where officers attached warrantless GPS

17   tracker to vehicle and then conducted traffic stop because "the

18   officers would have found the car and been able to conduct the

19   traffic stop without using the GPS tracking information").

20        Thus, the Court should deny defendants' motion on these bases

21   alone.

22

23   ────────────────────

24        [5] For example, after learning that defendants had entered the
     United States and assuming it would take them at the very least 24
25   hours to reach the San Bernardino area from Michigan, investigators
     could have set up surveillance units staring on the evening of
26   October 21 near the spot where KARAC picked up cocaine in March and
     at the Cowboy Burgers and BBQ where he drove immediately afterwards.
27   Even in the unlikely event that the surveillance units would have
     missed the large semi-truck stopping about a mile from where the
28   March exchange occurred, they would have without doubt seen the semi-
     truck enter the Cowboy Burgers and BBQ and, given the similarity to
     KARAC's route, searched the truck and found evidence of the dry run.

**B.   The Installation and Use of the Tracking Devices Was Lawful and Supported by Probable Cause and Reasonable Suspicion**

In any event, the installation and use of the tracking devices was lawful under the Fourth Amendment.  Even without any individualized suspicion (which was present in this case), the warrantless installation of the devices was justified under the border search exception and, thus, there was no illegal trespass as in Jones.  The subsequent short-term monitoring of the devices was also reasonable, especially given the probable cause and reasonable suspicion that defendants were entering the United States to engage in drug trafficking.

**1.   The Installation of the Tracking Devices at the Border Was Permissible Even Without Individualized Suspicion**

The border exception to the Fourth Amendment's warrant requirement permits warrantless and suspiciousness searches of vehicles at the border.  See, e.g., United States v. Flores-Montano, 541 U.S. 149, 152-153 (2004).  As the Supreme Court has repeatedly held, the very balance of reasonableness "is qualitatively different at the international border than in the interior." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).  "[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." Id. at 539-540 (internal citations omitted).  Thus, searches conducted at the border are per se reasonable "simply by virtue of the fact that they occur at the border." United States v. Ramsey, 431 U.S. 606, 616 (1977).  Entrants, therefore, are subject to search even in the absence of

1  reasonable suspicion, probable cause, or a warrant.  Id. at 619;

2  Almeida Sanchez v. United States, 413 U.S. 266, 272 (1973).

3       Under these well-established principles, the government submits

4  that the installation of a GPS device is permitted at the border

5  without a warrant and without individualized suspicion (which, in any

6  event, was present in this case).  The Supreme Court held in Jones

7  that the warrantless installation of a tracker device on a vehicle –

8  not at the border – violated the Fourth Amendment because "[t]he

9  Government physically occupied private property" in order to install

10  the tracking device.  565 U.S. at 404.  Here, on the other hand,

11  there was no such illegal trespass because, under the long-standing

12  border search doctrine, warrantless searches are permitted at the

13  border even in the absence of any individualized suspicion.

14       Defendants concede that border agents had the right to search

15  their truck and "to trespass against their property" at the border.

16  (Mot. at 11.)  The installation of a tracking device is no different

17  than any other trespass.[6]  See Jones, 565 U.S. at 404-11 (applying

18  the "common-law trespassory test" to the installation of a tracking

19  device on a vehicle).  Indeed, the Supreme Court has upheld far more

20  intrusive border searches without requiring any individualized

21  suspicion.  For example, in Flores-Montano, the Supreme Court

22  acknowledged that removing, disassembling, and reassembling a

23  vehicle's fuel tank was a "not insignificant" interference with a

24

25  ────────────────

26       [6] Defendants contend, without any supporting authority, that the
   installation of a tracking device is a "more intrusive trespass" that
   falls outside the scope of the border authority.  (Mot. at 11.)  But

27  defendants fail to explain how the mere installation of a tracking
   device – which must be considered separately from its subsequent use

28  – is different from other types of border searches that courts
   routinely permit without individualized suspicion.

motorist's possessory interest in his vehicle, but found that "it nevertheless is justified by the Government's paramount interest in protecting the border." Flores-Montano, 541 U.S. at 155.  The Court thus held that such a search, which "involves a brief procedure that can be reversed without damaging the safety or operation of the vehicle," is permissible even in the absence of any suspicion.  Id. at 155-156.  As the Supreme Court found, "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person - dignity and privacy interests of the person being searched - simply do not carry over to vehicles." Id. at 152.

Accordingly, this Court should find that the installation of a GPS tracking device on a vehicle – which is far less intrusive than the disassembling of a fuel tank and can also be reversed without damaging the vehicle – is likewise permissible at the border even without any individualized suspicion.[7]

2. <u>Even if Individualized Suspicion Were Required, Investigators Had Probable Cause to Believe Defendants Were Engaged in Drug Exportation</u>

If the Court finds that the installation of a GPS tracker falls within the narrow category of border searches for which reasonable suspicion is required, the investigators in this case had not just

---

[7] This is especially true in this case because defendants were driving a commercial semi-truck and, like all individuals operating commercial vessels subject to search at inspection check points, they had a significantly reduced expectation of privacy in their vehicle. Cf. Almeida Sanchez, 413 U.S. at 271 ("businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade"; "[t]he businessman in a regulated industry in effect consents to the restrictions placed upon him").

1  reasonable suspicion, but probable cause that defendants were
2  entering the United States to engage in the exportation of drugs.
3      Contrary to defendants' contention that "investigators based
4  their suspicion on pure speculation," (mot. at 17), they had
5  substantial reasons to believe that defendants were entering the
6  United States to engage in drug trafficking before the GPS devices
7  were installed.  Specifically, investigators knew the following
8  information: (1) KARAC had been intercepted transporting
9  approximately 194 kilograms of cocaine in a BO-MAK truck a few months
10 earlier; (2) IGNJATOV was the owner of BO-MAK and KARAC worked for
11 him as a driver; (3) KARAC had transported cocaine from Southern
12 California previously; (4) IGNJATOV had picked up the BO-MAK truck
13 KARAC used to transport cocaine from police impound; (5) IGNJATOV had
14 been intercepted in 2014 arranging for the transportation of cocaine
15 from New York to Canada in a BO-MAK truck; (6) BOSS told CHS1 in an
16 encrypted message that he intended to resume shipping cocaine soon;
17 (7) BOSS told CHS1 that he spoke to "buddys brother" (believed to be
18 IGNJATOV) about resuming the transportation of cocaine; (8) IGNJATOV
19 and HRISTOVSKI were planning to enter the country trough Port Huron,
20 Michigan in a BO-MAK truck (like KARAC had done) and travel to a
21 location that was just 45 minutes away from where KARAC had picked up
22 cocaine in March; and (9) this was the first known trip made by any
23 BO-MAK truck to California since the March cocaine seizure.  (Monroe
24 Decl. ¶ 12.)  The totality of these circumstances is more than
25 sufficient to establish probable cause – and, by extension,
26 reasonable suspicion - that IGNJATOV and HRISTOVSKI were entering the
27 United States in order to pick up a shipment of cocaine in Southern
28 California for eventual transportation back to Canada.  (Ibid.)

Defendants suggest that reasonable suspicion was lacking in this case because "the agents' suspicions were limited to their belief that the suspects would be performing 'dry runs.'"[8]  But this argument is simply not supported by the facts.[9]  At the end of April 2017, BOSS sent CHS1 a message stating that they should continue doing dry runs for a month "before we make them live."  (Monroe Decl. ¶ 9.)  As SA Monroe explains, based on her training and experience, she believed that "make them live" referred to resuming the transportation of real cocaine.  (Ibid.)  Then, at the end of May, using coded language, BOSS told CHS1 that IGNJATOV ("buddys brother") wanted to resume shipping cocaine ("wants to get back to work").  Thus, by the time defendants entered the United States in October, investigators had ample reason to believe that the DTO had resumed transporting cocaine and that defendants were planning to export cocaine from the United States to Canada.  (Monroe Decl. ¶ 12.)

Defendants also contend that reasonable suspicion was lacking because the government was investigating a conspiracy to transport cocaine from the United States to Canada, rather than from Canada into the United States, and, therefore, there was no reason to suspect that contraband would be found in the truck when entering the United States.  (Mot. at 12.)  This argument should also be rejected.  "The justification behind the border search exception is broad enough

---

[8] Defendants ignore that the dry run they conducted to determine the safety of routes used by the DTO to transport cocaine was in furtherance of the drug trafficking conspiracy and evidence of that conspiracy.  Thus, even if investigators believed defendants were entering only to conduct a dry run, they would have had probable cause that defendants were engaging in a drug trafficking conspiracy.

[9] Defendants' citation to a Homeland Security Investigation report describing the fact that this was a dry run after surveillance was completed has no bearing on the agents' beliefs and anticipation before initiating surveillance.  (Mot. at 12.)

19

to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export contraband illegally, through searches initiated at the border." United States v. Kolsuz, -- F. 3d --, 2018 WL 2122085, at *7 (4th Cir. May 9, 2018) (emphasis added); see also United States v. Ramos, 190 F. Supp. 3d 992, 999 (S.D. Cal. 2016) (approving post-arrest "investigatory" border search of cell phone for information about larger smuggling organization and "more contraband entering into the country at that time"). Thus, investigators' reasonable suspicion that defendants were entering the United States to further the DTO's ongoing efforts to export cocaine from the United States into Canada falls squarely within the scope of the border search doctrine. See, e.g., Kolsuz, 2018 WL 2122085, at *6 (holding that illegal exportation "is a transnational offense that goes to the heart of the border search exception, which rests in part on 'the sovereign interest of protecting and monitoring exports from the country.'") (internal citation omitted).

Finally, contrary to defendants' contentions (mot. at 17), the bases for the reasonable suspicion and probable cause in this case were not stale. Agents were investigating an ongoing, long-term drug trafficking conspiracy. They knew from KARAC's post-arrest statements that he had transported cocaine for the organization on multiple occasions, indicating that the March seizure was part of a larger conspiracy; and they knew from the encrypted messages between BOSS and CHS1 at the end of April and May that the organization was conducting dry runs and planning to resume transporting real cocaine, confirming that the conspiracy continued after the March seizure. (Monroe Decl. ¶¶ 6, 9.) When the offense under investigation "is a

long-term crime," "[t]he mere lapse of time is not controlling in a question of staleness." United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988).  Courts have rejected staleness challenges in cases involving far greater lapses of time than the five months that elapsed between the messages CHS1 and BOSS exchanged at the end of May and defendants' trip to California in October.  See, e.g., United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information was not stale because, "[w]hen the evidence sought is of an ongoing criminal business of a necessarily long-term nature ... rather than that of a completed act, greater lapses of time are permitted ...."); United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566 (9th Cir. 1989) (11-month-old information was not stale where "[t]he affidavit ... tended to establish the existence of a widespread, firmly entrenched, and ongoing narcotics operation in which [the defendant] played a pivotal role.  In such circumstances, staleness arguments lose much of their force."); accord United States v. Rowell, 903 F.2d 899, 903 (2nd Cir. 1990) (18-month-old information regarding drug distribution was not stale because "[n]arcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness") (internal quotations omitted).

Defendants do not contest that the installation of a tracking device at the border is lawful as long as it is supported by at least reasonable suspicion.  (Mot. at 11 ("Like the forensic search in Cotterman, the placement of a GPS device ... must be supported, at a minimum, by reasonable suspicion.").)  Nor could they.  Courts have consistently required no more than reasonable suspicion even when reviewing the most intrusive border searches.  For example, in

21

Montoya de Hernandez, the Supreme Court held that, as long as the government had reasonable suspicion, it could detain a traveler thought to be smuggling contraband in her alimentary canal for 16 hours while it monitored her bowel movements and sought a court order for a rectal examination.  473 U.S. at 534-35.  In United States v. Cotterman, the Ninth Circuit held that the search of a computer, which was seized at the border, shipped 170 miles away, and then subjected to a full forensic examination five days after the border crossing, was permissible if supported by reasonable suspicion.  709 F.3d 952, 963-68 (9th Cir. 2013).  The installation of a tracking device on a vehicle is nowhere near as intrusive as a 16-hour detention of a person and monitoring of bowl movements, or the full forensic examination of a personal computer that remained in law enforcement custody for five days before agents uncovered any evidence of criminal activity.  Accordingly, if the substantially intrusive border searches in Montoya de Hernandez and Cotterman required only reasonable suspicion to be lawful, no more can be required in this case.

For the reasons discussed above, investigators had substantial reasonable suspicion and probable cause that defendants were entering the United States to traffic cocaine over the United States-Canada border.  Thus, if the Court finds that individualized suspicion were necessary, the installation of the tracking devices on defendants' vehicle at the border was lawful.

3.   The Short-Term Monitoring of the Tracking Devices Was Reasonable and Permissible Under Jones

The monitoring of the tracking devices beyond the border for a period of less than 48 hours - from the time that the trackers were

22

installed until the time that agents began conducting continuous physical surveillance – was reasonable and lawful under the Fourth Amendment.  In Jones, the Supreme Court left open the possibility that monitoring the movements of an individual through electronic means, without an accompanying trespass, would be constitutional. 565 U.S. at 412.  Indeed, the Court made clear that its decision in United States v. Knotts, 460 U.S. 276 (1983), which held that the use of an electronic device to monitor a vehicle's movements on public roads was lawful under the Fourth Amendment, was consistent with the holding in Jones since there had been no trespass in Knotts.  Id. at 408-09.  The concurring opinion posited that "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable."  Id. at 430 (J. Alito, concurring).  Thus, like in Knotts, because there was no unlawful trespass here pursuant to the border search doctrine, the "relatively short-term monitoring" of defendants' movements on public roads for less than 48 hours was reasonable and permissible under the Fourth Amendment.  Id.; Knotts, 460 U.S. at 281-82.

Even if the Court finds that the use of a GPS device beyond the border must be supported by reasonable suspicion or probable cause, the use of the trackers in this case was lawful.  For the reasons discussed above, the investigators had reasonable suspicion and probable cause to believe that defendants were engaged in the exportation of cocaine.

In other contexts, the Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which

warrantless searches would not be reasonable in other contexts." United States v. Chadwick, 433 U.S. 1, 12 (1977); see also New York v. Class, 475 U.S. 106, 112 (1986) (recognizing "lessened expectation of privacy" in a vehicle); Jones, 562 U.S. at 412 (leaving unanswered whether the warrantless installation and use of a GPS tracker device is permissible where there exists reasonable suspicion or probable cause).  The use of a tracker device, especially when it is monitored for a limited period of time, is similarly - or even less - intrusive than other types of automobile searches that are permitted without a warrant.  The device does not reveal who or what is in the car, what the occupants are doing, or what they do when they arrive at their destination; it provides only information about the vehicle's location, which the driver has knowingly exposed to the public. Thus, as with other searches of automobiles, because the investigators in this case had reasonable suspicion and probable cause that defendants were engaged in illegal activity, the short-term monitoring of GPS devices on their vehicle was lawful.

**C. Even if the Installation and Use of the Tracking Devices was Unlawful, the Evidence is Still Admissible Under the Good Faith Exception to the Exclusionary Rule**

Finally, even if the Court were to find that the installation and use of the tracking devices was unlawful and that neither the attenuation doctrine nor the inevitable discovery doctrine applies, the challenged evidence is still admissible under the good-faith exception to the exclusionary rule.  Under that exception, evidence obtained in violation of the Fourth Amendment is not subject to the exclusionary rule if the officers acted "in reasonable reliance on binding precedent."  Davis v. United States, 564 U.S. 229, 241

1   (2011).  "Excluding evidence in such cases deters no police

2   misconduct and imposes substantial social costs."  Id. at 249.

3        At the time that the trackers were installed on defendants'

4   truck and trailer, there was no case law suggesting that anything

5   more than reasonable suspicion is ever required in the context of a

6   border search.  See Kolsuz, 2018 WL 2122085, at *9 (affirming denial

7   of motion to suppress under good faith exception where agents seized

8   defendant's smartphone at the border "and subjected it to a month-

9   long off-site forensic analysis" because, at the time of the

10  challenged search, "there was no case suggesting that even more [than

11  reasonable suspicion] would be necessary ... for any border search,

12  no matter how nonroutine or invasive.  And that remains the case

13  today[.]").  To the contrary, the Supreme Court had held that far

14  more intrusive searches were permitted at the border so long as they

15  were supported by reasonable suspicion.  See Montoya de Hernandez,

16  473 U.S. at 544.  Accordingly, it was reasonable for the agents who

17  installed and used the trackers on defendants' vehicle to rely on the

18  established and uniform body of precedent allowing warrantless border

19  searches supported by reasonable suspicion in all circumstances.  In

20  any event, as noted, even if probable cause or reasonable suspicion

21  were required, the facts here were more than sufficient.

22  **IV.  CONCLUSION**

23       For the foregoing reasons, the government respectfully requests

24  that this Court deny defendants IGNJATOV and HRISTOVSKI's joint

25  motion to suppress evidence without an evidentiary hearing.

26

27

28

                                    25