STEVEN F. GRUEL (SBN 213148)
E-Mail: attystevengruel@sbcglobal.net
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 989-1253
Fax: (415) 449-3622
Attorney for Defendant IGNJATOV

MARILYN E. BEDNARSKI (SBN 105322)
E-Mail: mbednarski@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Fax: (626) 844-7670
Attorney for Defendant HRISTOVSKI

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. ED CR 17-222(A)-JGB |
| Plaintiff, | [Honorable Jesus G. Bernal] |
| v. | REPLY TO GOVERNMENT'S OPPOSITION TO JOINT MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI; DECLARATION GRUEL; EXHIBITS |
| SLAVCO IGNJATOV, et al., | |
| Defendants. | |
| | Date: June 25, 2018 |
| | Time: 2:00 p.m. |

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITES** ..........................................1

**I.  THE GOVERNMENT FAILS FACTUALLY AND LEGALLY TO CARRY ITS BURDEN TO ESTABLISH THE LAWFULNESS OF THE WARRANTLESS INSTALLATION AND USE OF THE GPS DEVICES.** ........................................................................................................1

    A. The Government Relies On Misleading Claims And Distinguishable Out-Of-Circuit Case Law In Its Failed Effort To Justify The Search As Sufficiently Attenuated From The Illegality..........................................1

    B. The Government Relies On Misleading Claims And An Out of Circuit Unpublished Case In Its Failed Effort To Justify The Discovery of the Evidence as Inevitable. ........................................................................5

**II. THE WARRANTLESS INSTALLATION AND USE OF THE GPS TRACKERS WAS ILLEGAL** ........................................................................7

    A. The Installation Of Two GPS Trackers On The Defendants' Truck Is More Invasive Than Permissible Border Searches ...............................7

    B. The Government Has Failed To Identify Specific And Articulable Facts That Would Give Rise To Reasonable Suspicion. .........................9

    C. There Is No Legal Justification For The Warrantless Monitoring Of The Defendants' Every Movement For 48 Hours And 2,000 Miles....13

**III. THIS COURT SHOULD REJECT THE GOVERNMENT'S TORTURED READING OF THE "GOOD FAITH" EXCEPTION.** .......14

**IV. CONCLUSION**……………………………………………………..15

**Declaration of Steven Gruel; Exhibits A thru I**

i

# TABLE OF AUTHORITIES

## Federal Cases

*Brown v. Illinois*
    422 U.S. 590 (1975)..................................................................................1, 2

*Brown v. Texas*
    443 U.S. 47 (1979).........................................................................................9

*Davis v. United States*
    564 U.S. 229 (2011)................................................................................14, 15

*Florida v. Royer*
    460 U.S. 491 (1983).......................................................................................9

*Nardone v. United States*
    308 U.S. 338 (1939).......................................................................................2

*Terry v. Ohio*
    392 U.S. 1 .....................................................................................................9

*United States v. Carrion*
    463 F.2d 704 (9th Cir. 1972) ........................................................................1

*United States v. Flores-Montaro*
    541 U.S. 149 (2004).......................................................................................8

*United States v. Irwin*
    612 F.2d 1182 (9th Cir. 1980) ......................................................................1

*United States v. Jones*
    565 U.S. 400 (2012) .....................................................................4, 13, 14, 15

*United States v. Kolsuz*
    890 F.3d 133 (4th Cir. 2017) ......................................................................15

*United States v. Lee*
    862 F.Supp.2d 560 (E.D. Ky. 2012).........................................................4, 5

*United States v. Lopez-Soto*
    205 F.3d 1101 (9th Cir. 2000) .....................................................................9

*United States v. Luna-Santillanes*
    554 Fed. Appx. 402 (6th Cir. 2014) ................................................................... 7

*United States v. Martin*
    712 F.3d 1080 (7th Cir. 2013) ..................................................................... 3, 4

*United States v. McLayea*
    2014 WL 931882 (S.D. Ind. March 7, 2014) ...................................................... 4

*United States v. Montoya De Hernandez*
    473 U.S. 531 (1985) ................................................................................. 15

*United States v. Thomas*
    211 F.3d 1186 (9th Cir. 2000) ..................................................................... 11

*Wright v. Dickson*
    336 F.2d 878 (9th Cir. 1964), *cert. denied*, 386 U.S. 1012, 87 S.Ct.
    1360, 18 L.Ed.2d 444 (1967) ....................................................................... 1

**Constitutional Provisions**

Fourth Amendment ................................................................. 8, 11, 13, 14

# MEMORANDUM OF POINTS AND AUTHORITES

I. **The Government Fails Factually and Legally to Carry Its Burden To Establish the Lawfulness of The Warrantless Installation and Use of the GPS Devices.**

The defense position is that a warrant based upon probable cause and issued by a neutral judicial officer was required for the installation and use of the GPS devices. The government posits multiple exceptions to the exclusionary rule (attenuation and inevitable discovery), then claims this was a border search which did not require a warrant nor even proof of reasonable suspicion, and lastly attempts to save this flawed search with a claim of good faith. The defense disputes[1] the government declarants' assertions of fact in significant respects. Neither the facts nor the legal authorities cited by the government support any of these justifications.

> **A. The Government Relies On Misleading Claims And Distinguishable Out-Of-Circuit Case Law In Its Failed Effort To Justify The Search As Sufficiently Attenuated From The Illegality**.

The government cannot meet its burden of establishing attenuation. *Brown v. Illinois*, 422 U.S. 590, 604 (1975). The government's out of circuit non-binding

---

[1] The defendants seek an evidentiary hearing and opportunity to cross examine the government's declarants. With this Reply brief, defendants file a Declaration by attorney Steven Gruel which identifies multiple additional facts from the discovery--relevant to the suppression issues--but omitted in the agents' declarations. The credibility of the government's declarants is in issue and an evidentiary hearing is necessary and fair. *Wright v. Dickson*, 336 F.2d 878, 881 (9th Cir. 1964), *cert. denied*, 386 U.S. 1012, 87 S.Ct. 1360, 18 L.Ed.2d 444 (1967); *see also United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972); see also *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (If material issue is raised "which if resolved in accordance with (appellant's) contentions would entitle him to relief," an evidentiary hearing is required.").

authorities are unpersuasive.  Unlike those cases, here the investigators exploited the unlawful use of the GPS to precisely locate the defendants' truck, **and** they relied on the surveillance data to generate evidence to corroborate their suspicions of criminal activity that contributed to their asserted factual basis for the stop/search on October 23 and arrest on October 28.

The core question in the attenuation analysis is whether the evidence at issue was ". . . 'come by at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Brown,* 422 U.S. at 599, *quoting* Maguire, "Evidence of Guilt," 221 (1959) and *Nardone v. United States*, 308 U.S. 338, 487-488 (1939).  The *Brown* court sought to determine whether the defendant's confessions, given after his illegal arrest without probable cause, was admissible when the confessions were made at the station after the giving of Miranda warnings.  The *Brown* court articulated that no single fact is dispositive and articulated three relevant factors to determining attenuation: 1)The temporal proximity of the illegality and the evidence obtained; 2)The presence of intervening circumstances; and, 3) particularly, the purpose and flagrancy of the official misconduct. 422 U.S. at 603-4.

In this case, the second and third factor heavily favor the defense while the first is insignificant. Temporal proximity is the least applicable factor in this case in determining whether the chain of causality was broken.  Here the physical surveillance was initiated by reliance on the GPS location data.  It does not matter if after relying on the GPS, the agents watched the truck for 2 hours or 20 hours before they stopped the truck. The second factor, the lack of independent intervening events weighs against the government. The GPS trackers identified continuously and in real time the exact location of the truck. The physical surveillance is not an independent intervening circumstance, rather an extension of the illegal use of the GPS. The agents had no specific tip that any transaction

would occur or where or when that might be. They only knew exactly where and when to find the defendants to start their physical surveillance because of the GPS tracking. Unlike the cases cited by the government, there was no independent event justifying the stop (i.e. independent patrol officer witnessed a traffic violation or arrest based upon probable cause for robbery and attendant search of his car incident to that arrest). Rather here, the stop and seizure of evidence at the Cowboy Burger was simply a continuation of the agents' investigation.

Finally, the third factor –the purpose of the misconduct--also weighs against the government, and should weigh heavily due to its flagrant nature. The purpose of the illegal use of the GPS was to further the investigation. The agents sought to find out if there would be a pick up or drop off of illegal drugs, and where and when that would occur. They sought to find out what route the BoMak truck would take, and if it would be similar to the Karac route. The agents had days to obtain a warrant. They had legal advisors and supervisors available, yet did not seek guidance. Decl. Gruel at 5. The agents were not relying on established case precedent, nor even a written policy. See Decl. Gruel at 3-9 (no written support for any such purported rule, no consultation with any AUSA or support from USA manual, no policy known to border experts, and none produced in discovery).

The government heavily relies on *United States v. Martin*, 712 F.3d 1080, 1082 (7th Cir. 2013), a Seventh Circuit case addressing a pre-*Jones* investigation of a bank robbery and use of a GPS device on the defendant's car. The Seventh Circuit concluded based on a limited and not fully developed record[2] that irrespective of whether the application of the GPS device was legal, the subsequent

---

[2] The court also noted that the defendant in *Martin* failed to respond to the government's attenuation argument and acknowledged that "[p]erhaps if Martin had developed this argument more fully at the district court level, that gap could have been filled." *Id*. at 1082.

3

search was sufficiently "attenuated" because the "GPS data here appears simply to have aided law enforcement officials in tracking down Martin when they decided to effectuate his arrest." *Id*. at 1082. The agents had independent probable cause to arrest him for bank robbery and to search his car for evidence of the robbery. The *Martin* court distinguished the use of the GPS data from the one in *Jones* in which "the GPS data was used to establish a necessary link between the defendant and a cocaine stash house." *Id*. In *United States v. McLayea*, 2014 WL 931882 (S.D. Ind. March 7, 2014), another case relied upon by the government, the Indiana District Court cited *Martin* and invoked similar reasoning.

*United States v. Lee*, 862 F.Supp.2d 560 (E.D. Ky. 2012), a case distinguished in *McLayea*, reached a different result. In *Lee*, the investigators secretly attached a GPS device to the defendant's car and monitored his movements as he drove to Chicago, where the agents believed he picked up marijuana. *Id*. at 562. The court held that the search was not attenuated from the illegality because the government relied on the evidentiary value of the GPS evidence to support the subsequent detention and search: "All of that information [used to develop probable cause] was based on the illegal search. Without the GPS tracking data, the DEA agents would not have known that Lee traveled to Chicago (his source for drugs), that he was returning to Kentucky along I-75, or his exact position." *Id*. at 565.

The present case is closer to the facts in *Lee*, than *Martin*. Moreover, even before the investigators began physical surveillance of the defendants' truck, they relied upon the evidentiary significance of its movements to support their hunch that the defendants were up to no good. Agent Monroe emphasized that the defendants used a similar route to get to California. *See* Monroe Decl., Dkt. No. 87-1 at ¶13. The GPS data corroborated Monroe's theory defendants were involved in the conspiracy she had been investigating since early 2016. Had the defendants

substantially deviated from the Karac route or made a delivery in a different part of the country, it would have cut against Monroe's theories as to the allegedly criminal nature of the defendants' trip. As in *Lee*, the reliance upon the GPS data to corroborate the investigators' initial suspicions and to allow them to locate the defendants eviscerates the government's attenuation argument.[3]

### B. The Government Relies On Misleading Claims And An Out of Circuit Unpublished Case In Its Failed Effort To Justify The Discovery of the Evidence as Inevitable.

The government makes the incredible argument that the investigators would have inevitably discovered the challenged evidence, suggesting that they would have found the truck at some point in California and, thus, observed the sugar transaction. The government claims defy common sense that investigators could have located the defendants' truck "by setting up surveillance units along the route KARAC used in March, using aerial surveillance[4], or by requesting local patrol officers[5] to be on the lookout for the BO-MAK truck." *See* Govt. Opp. at 14:8-11. The government makes much of the similarities between the route travelled by

---

[3] The government dedicates considerable space to a so-called "48-hour rule." As discussed in greater detail below, this "rule" has no basis in the law, and the government's invocation of it is a red herring.

[4] The truck entered the country after 7 p.m. on October 20, 2017 and traveled across the country during day and evening hours, Common sense suggests that nighttime aerial surveillance of the truck would have been impossible. Moreover, even daytime surveillance would be unlikely to succeed because no conventional aircraft could sustain such a slow flight speed while flying over a truck for thousands of miles (assuming trucks travel at 50-70 mph) without refueling and breaking the monitoring in the process.

[5] It is unlikely that local patrol officers across multiple jurisdictions could have been engaged or could have succeeded in continuously tracking a truck as it crossed the country. It's even more unlikely that a patrol vehicle could have sat for days monitoring the freeways watching for one of what must be thousands of semi-trucks whizzing by at 70 mph. A vehicle travelling at 50 mph will travel 264,000 ft/hour or 4,400 feet/minute or 73 feet/ second. Thus, if an officer looked away for 3 seconds, a vehicle passing would be 219 feet passed him by the time he looked up.

Karac and the one taken by the defendants, but the routes were not identical and any similarities between the two routes was unknown and unpredictable to the agents at the time the defendants entered the country. The government's rear view analysis holds no legal weight. The investigators had no clue that the defendants would meet with an unknown male approximately one mile from the site where Karac allegedly obtained the cocaine, and they could not have predicted that the defendants would, like Karac, go to Cowboy Burgers and BBQ[6] after the meeting. These parallels movements, offered by the government as proof of inevitable discovery, were meaningless before they occurred. The government's reference to them now, after the fact, is of no moment when considering the issue of inevitable discovery.

     Similarly, the government's insistence that it could have inevitably located the truck because the alleged handoff took place "about a mile from where the March exchange occurred" is equally implausible. Before it happened, the government had no way of knowing that this exchange would take place in the same city, much less within a mile of the prior one. These correspondences, while seemingly significant with hindsight, were insignificant at the time the investigators were monitoring the defendants. Between those two end points of the mile distance are many obstructions that would not permit anyone on patrol at the exact right time to locate a truck without driving up and down block after block around warehouses and buildings in search of a truck. For all the investigators knew, some type of handoff could have occurred anywhere between Michigan and La Puente, CA. Under the circumstances, a decision to establish 24-hour

---

[6] Even if the investigators waited at Cowboy Burgers, anticipating that the defendants might stop there, it would be pointless. But for the preceding observation of the defendants' interaction with the unknown male and the duffle bag, the investigators would have had no reason to detain the defendants in the first place.

surveillance in an undetermined spot at some undetermined distance from the location of the Karac exchange five months earlier would have been ludicrous.

The government's reliance on *United States v. Luna-Santillanes*, 554 Fed. Appx. 402 (6th Cir. 2014) is misplaced. There, agents already knew from the Ci what vehicles would be used to transport the drugs, where those vehicles would go, and already had a warrant to track the cell phone of one of the people involved in the transaction. Based on these facts, the court found they would inevitably have discovered the evidence without the use of the GPS. In contrast, as argued above, the circumstances here make it doubtful that the officers would have found the defendants to initiate physical surveillance without the GPS tracking.

## II. The Warrantless Installation and Use Of The GPS Trackers Was Illegal

No one crossing the border would reasonably expect inspection to occur, they would not reasonably expect the government to affix a GPS device to their vehicle and monitor it as they drove thousands of miles away from the border.

### A. The Installation Of Two GPS Trackers On The Defendants' Truck Is More Invasive Than Permissible Border Searches

The government maintains that its agents have the right to affix GPS devices to cars entering the border, even in the absence of reasonable suspicion or probable cause. The government's argument is based on a flawed premise that the application of a GPS tracker to a vehicle entering the border is no more invasive or consequential than the sorts of routine trespasses that accompany ordinary border searches that take place every day. *See* Govt. Opp. at 16:16-17.[7]

---

[7] Defendants' use of the term "trespass" against their property in their moving papers at p.11:18 is given an unintended meaning by the government. Opp. at p.16:15. Defendants only meant that, in order to inspect their truck and trailer upon entry to the U.S., the border agents would necessarily X-ray or "board" the vehicle and look inside.

7

The government relies upon *United States v. Flores-Montaro*, 541 U.S. 149, 155 (2004), in which the United States Supreme Court held that it was constitutional for border patrol agents "to remove, disassemble, and reassemble a vehicle's fuel tank" as part of a routine border search. Central to the Court's holding was the fact that approximately 25% of drug seizures at the border involved attempts to smuggle drugs in vehicle gas tanks. *Id*. at 153-154. More importantly, the Court concluded, "A gas tank search involves a brief procedure that can be reversed without damaging the safety or operation of the vehicle." *Id*. at 155. Indeed, the Court recognized that "that some searches of property are so destructive as to require a different result." *Id*. at 155-156.

At first blush, one might be tempted to characterize the removal of a gas tank as a more invasive search tactic than the covert mounting of a GPS tracker, but this overlooks the detrimental ramifications that the surreptitious application of a GPS tracker on a person's vehicle necessarily entails. Unless and until the motorist discovers the GPS device, the vehicle has been fundamentally changed. The vehicle is perpetually subject to remote monitoring and isn't restored to the same condition it was in before the border search until the device is removed, making it more invasive than the sorts of searches approved in *Flores-Montaro*.

Consider, for example, the consequences that may arise from the later discovery of a GPS tracker. Any unsuspecting motorist who, perhaps during maintenance or repair, eventually discovers the GPS device will certainly be worried, perhaps paranoid at the revelation that his or her whereabouts were being intentionally and secretly monitored by an unknown third party. Additionally, the fact that the device remains on the vehicle means that it is still capable of being monitored without the party realizing it. Leaving the government subject to no more oversight than a customary "honor system" is not the sort of protection contemplated by the Fourth Amendment. This is especially problematic when, as

here, the vehicle is anticipated to return to another sovereign nation, outside the reach of the Constitution's protections.

### B. The Government Has Failed To Identify Specific And Articulable Facts That Would Give Rise To Reasonable Suspicion.

The government misunderstands the defendants' argument concerning the unlawful installation of the tracking device. *See* Govt. Opp. at 21:22 ("Defendants do not contest that the installation of a tracking device at the border is lawful as long as it is supported by at least reasonable suspicion."). This is a mischaracterization of the defendants' position. As stated in the moving papers, the surreptitious application of a GPS device at the border, intended to monitor a person's movements within the boundaries of the United States, requires a warrant supported by probable cause. It is the defendants' position that the investigators in the present case lacked reasonable suspicion *and*, by extension, probable cause.

To establish "reasonable suspicion," an officer must rely upon *specific and articulable facts* supporting an inference that (1) some criminal activity was occurring, and (2) the detained individual had been involved in such activity. *Terry v. Ohio*, 392 U.S. 1, 18-19; *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Brown v. Texas*, 443 U.S. 47, 51 (1979); *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (reasonable suspicion is created by specific, articulable facts that, when considered together with objective and reasonable inferences, establish a basis for suspecting that the particular person detained is engaged in criminal activity) (internal quotations omitted). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and be capable of rational explanation." *Lopez-Soto*, 205 F.3d at 1105 (citations and internal quotations omitted).

The government's "nine facts" which it contends established reasonable suspicion for the searches (Govt. Opp. at 18:8-24), upon close scrutiny and when viewed in light of relevant omitted facts, are revealed to be irrelevant, insubstantial, or based on pure conjecture. The government relies heavily on Karac's arrest; however, aside from Karac's status as Ignjatov's brother-in-law and employee, there was no evidence that Ignatov had any prior knowledge of or role in Karac's activities. Moreover, the fact that Ignjatov flew to L.A. to retrieve the truck is in no way inculpatory. Ignjatov, BoMak's owner, had a legitimate interest in protecting the truck and its contents from loss or destruction. Agent Monroe knew that BoMak is a small trucking company and that the company had legitimate business in California carrying loads of frozen pastries to a QCD distribution center for Starbuck's in La Puente. Decl. Gruel at 11, and Manifest Exhibit C. She likely knew, but omits in her recitation of facts, that Mr. Ignjatov's March 2017 trip to California was for the purpose of claiming the impounded truck with its perishable cargo of frozen food.  Decl. Gruel at 11.

The arrest of Karac, without more, is wholly irrelevant to establishing reasonable suspicion as to the defendants in this case. The only fact the government cites to establish a connection between Karac's activities and Ignjatov is a message between Boss and CHS-1 in which Boss referred to someone associated with Karac as "buddy's brother." *See* Govt. Opp. at 18. While Agent Monroe speculates that during the May to June 2017 cooperation by CHS-1 references to the word brother and brothers was to Ignjatov because he is Karac's brother <u>in law</u>, she omits the existence and knowledge of repeated references in the investigation to other brothers, not these brothers in law.  Decl. Gruel at 11d.  Such omissions include:

10

- Monroe would have known from Karac's post arrest interview report that he had a brother who worked for the same trucking company and had driven in the past. Decl. Gruel at 11d; Exh. D.

- Monroe knew from CHS-1 that the drug organization involved other brothers including the "Wonk brothers;" that the Boss was using the Wonk brothers to help with the new Chicago transport; and, they had previously shipped cocaine to Chicago. Decl. Gruel at 11e, 11k; Exh. H.

- That CHS-1 told Monroe about a worker for the Boss named "Little Bro" who transported 50 to 90 kilos at a time, had coordinated several shipments for the Boss and had a brother named Bobby. Decl. Gruel at 11f.

- That Monroe knew many members of the organization referred to each other as "bro" or "brother." Decl. Gruel at 11e, 11j; Exh. G (texts).

These omitted facts significantly weaken the inference that "brother" was a reference to Ignjatov. Mere speculation—a hunch—does not establish reasonable suspicion. *See United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) ("A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion.")

Similarly, CHS-1's statement that Boss intended to start shipping cocaine again has no evidentiary value because it's based on the government's assumption and speculation that Ignjatov and BoMak were tied to Karac's activities. The Boss' intention to resume shipping cocaine could refer to any transport network associated with that conspiracy. In fact, Monroe omitted in her summary that informants had mentioned the Boss used several other trucking companies and had provided names of such companies including Daylight Transport and Focus Transport. Decl. Gruel at 11i. In Agent Monroe's declaration she states that this was the first time a BoMak truck made a trip to California since Karac's arrest, suggesting that they were resuming illicit business. Again, Agent Monroe

selectively recites the facts in her declaration to misleadingly lead to particular inferences against these defendants while omitting facts that would lead to different inferences:

- Monroe omits that she was told by a CHS in March 2017 that the drug organization she was investigating no longer intended to use this trucking company (BoMak) as a distribution method. Decl. Gruel at 11g; Exh. E.

- She omits from her declaration information she had provided to judges in May 2017 when seeking search warrants for locations associated with the informant (before he was flipped) which information included that according to recorded conversations Karac was blamed for the seizure of the 194 kilos of cocaine and the organization sought to replace those shippers with more reliable people. To that end, the organization contacted the shippers who previously shipped drugs for them. Decl. Gruel at 11h; Exhibit F.

These omitted facts undermine the suggestion that Ignjatov and BoMak were involved in the conspiracy involving the Boss and the 194 kilograms.

      The government also suggests that there was an inculpatory aspect to the fact that the defendants planned a trip to deliver goods to Southern California ("just 45 minutes away from where KARAC had picked up cocaine in March) using a BoMak truck. This overlooks the reality that Ignjatov ran a legitimate trucking business (Decl. Gruel at 11a-b; Exh. C) **and** that there was a legal purpose for their entry into the country (the BoMak truck was filled with pastries that were scheduled for an actual delivery).

      Additionally, the government refers to a 2014 investigation in which Ignjatov was alleged to have been involved in an altogether unrelated conspiracy to transport cocaine between Canada and New York.  Agent Monroe omits that he was never arrested or charged based on that allegation.  Decl. Gruel at 11c. Moreover, she omits that three defendants were prosecuted out of that investigation with attempted importation/exportation of narcotics, and that there was no real

cocaine involved in that 2014 NY investigation. Decl. Gruel at 11c. The relevance of this prior investigation, especially in light of these omitted facts, is negligible. It occurred years earlier, produced no results, and seemingly bears no connection to the present investigation.

In sum, when these omitted facts are considered, the evidence fails to support a finding of reasonable suspicion, let alone probable cause, that the defendants intended to engage in criminal activity.

### C. There Is No Legal Justification For The Warrantless Monitoring Of The Defendants' Every Movement For 48 Hours And 2,000 Miles.

The government relies heavily upon dicta in *Jones* hypothesizing that it would be reasonable to monitor a GPS device for 48 hours without violating the Fourth Amendment. In fact, littered throughout the declarations submitted by Agent Monroe and Det. Mkrtchyan are references to other agents (e.g., SA Gernatt and SA Abair)[8] proclaiming the existence of a "48 hour rule," meaning that a GPS device applied at the border could legally be monitored for 48 hours. This claimed "rule" does not have the force of, or basis in, the law.

Perhaps Gernatt's belief was an outcropping of a reference made in a concurrence in *Jones* to short term GPS monitoring (i.e., 2-days), which reference was **not** made in the main opinion in the case. In his concurring opinion, Justice Alito rejected the trespass analysis favored by the majority and exclusively applied the *Katz* "reasonable expectation of privacy" test. *United States v. Jones*, 565 U.S. 400, 419 (2012) (Alito, J., concurring). "Under this approach," Alito reasoned, "relatively short-term monitoring of a person's movements on public streets

---

[8]   It's also notable that the investigators neglected to consult with an AUSA or other legal expert prior to applying the GPS devices.

accords with expectations of privacy that our society has recognized as reasonable." *Id*. at 430 (Alito, J., concurring). Writing for the majority, Scalia speculated that it would be impossible to pinpoint a specific timeframe within which GPS monitoring would cross the line from permissible to illegal, and he opined that it would require a more comprehensive analysis, taking into account the nature of the suspected crime. *Id*. at 412-413.

As discussed in the moving papers, this more comprehensive analysis weighs heavily in the defendants' favor in the present case. Taking into account the quantum of evidence against the defendants, the nature of the suspected offense, the duration of the monitoring, and the long physical distance over which it was conducted, there is no doubt that the government's monitoring of the defendants in this case violated reasonable expectations of privacy.

### III. This Court Should Reject the Government's Tortured Reading Of the "Good Faith" Exception.

The government argues that good faith applies here because at the time of the use of the trackers in this case there was no case suggesting that more than reasonable suspicion was required to use GPS trackers at the border. Govt. Opp. at 25. The government is wrong. The good faith exception articulated in *Davis v. United States*, 564 U.S. 229 (2011) does not apply here. There was no binding precedent on October 20, 2017 holding that GPS devices could be used at the border or beyond the border without a warrant. In fact, the Supreme Court's 2012 *Jones* case held that the Fourth Amendment applied to law enforcement's use of GPS devices. Admittedly, *Jones* did not address how that rule applied at the border, or the effect of days and thousands of miles of tracking beyond the border. Nevertheless, the current state of the case law would militate in favor of governmental restraint in the warrantless use of GPS trackers in any setting.

The government cites two cases that it claims provide authority for its use of GPS trackers, but both cases are way off base. In *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2017), the Fourth Circuit held that the reasonable suspicion standard applied to the forensic search of a cell phone seized at the time the suspect was detained at the border for firearms violations. The government also relies on *United States v. Montoya De Hernandez*, 473 U.S. 531 (1985) for the proposition that "far more intrusive searches were permitted at the border so long as they were supported by reasonable suspicion." *Montoya De Hernandez* involved the prolonged detention and court-ordered rectal search of a suspicious Colombian traveler who appeared to be transporting narcotics in her alimentary canal. *Id*. at 535-536. These searches, while intrusive, are neither surreptitious nor ongoing.

The search in this case, however, is not geographically limited to the border. Once the GPS tracker is affixed to the subject vehicle, it fundamentally alters the property, remaining with the vehicle, making it perpetually traceable, unless and until the tracker is located by the owner of the vehicle. The government has offered no case law that would support the legality of such a search. As Justice Sotomayor pointed out in her opinion concurring in the judgment, *Davis* "d[id] not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." 564 U.S. at 250.

## IV. Conclusion

It's also beyond dispute that the application of the GPS devices at the border contemplated a further search throughout the United States via the monitoring of the transmitted geolocation data. The case law was, and remains, unsettled, but there is plenty of language in *Jones* and other cases that should have dissuaded the government from failing to submit the information it had to a neutral judicial officer to assess whether to approve a warrant for GPS monitoring. The exclusionary rule exists to protect against such overreaching by law enforcement.

15

For all of the reasons raised in this reply and the moving papers, this Court should grant this motion and suppress all observations and evidence obtained as a result of the illegal use of the GPS monitoring device.

Dated: June 18, 2018                    Respectfully submitted,

/S/ *Steven F. Gruel*
STEVEN F. GRUEL
Attorney for Def. Ignjatov

/S/ *Marilyn E. Bednarski*
MARILYN E. BEDNARSKI
Attorney for Def. Hristovski