STEVEN F. GRUEL (SBN 213148)

315 Montgomery Street, 9th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net

www.gruellaw.com

Attorney for Defendant SLAVCO IGNJATOV

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SLAVCO IGNJATOV, et al.,<br><br>Defendants. | No. CR-17-0222-JSB<br><br>STEVEN F. GRUEL'S <u>SECOND DECLARATION</u> IN SUPPORT OF JOINT MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI;<br><br>Honorable Jesus G. Bernal |

I, STEVEN F. GRUEL, under penalty of perjury hereby declare as follows:

1.    I am attorney in good standing with the California State Bar. I am the attorney of record for defendant Slavco Ignjatov in the above-captioned case. This declaration is submitted in support of the reply to the government's

opposition to the defendants' motion to suppress evidence filed contemporaneously herewith.  I hereby state and declare as follows:

2.  Attached hereto as Exhibit A is the signed Declaration of defendant Slavco Ignjatov. The identical unsigned copy of this Declaration of defendant Slavco Ignjatov was filed on May 11, 2018.

3.  I reviewed the declarations of FBI Special Agent Hannah Monroe and Los Angeles Police Officer Asatur Mkrtchyan filed in support of the government's opposition to the JOINT MOTION TO SUPPRESS EVIDENCE BY DEFENDANTS IGNJATOV AND HRISTOVSKI. Both SA Monroe and Officer Mkrtchyan state that the decision to place the GPS tracking devices on the defendants' truck and trailer at the border without a warrant was predicated on the "understanding" of two special agents named Jack Gernatt and Greg Abair.  According to SA Monroe and Officer Mkrtchyan, the "understanding" of the other two agents Gernatt and Abair was that warrantless GPS installation was permitted as long as monitoring did not exceed 48 hours.  Plus, according to the two agents, this "48 rule" did not apply to commercial vehicles like semi-trucks whatsoever.

4.  No declarations have been provided by agents Gernatt and Abair to explain the basis for their "understanding" regarding warrantless installation of GPS devices at the border. Likewise, nothing provided in the government's discovery explains, much less supports, the warrantless GPS installation, the claimed 48-hour rule, or the commercial vehicle exception.

5.  While it appears that SA Monroe sought the assistance of at least one AUSA in obtaining several search warrants in May 2017, nothing in the government's discovery indicates that SA Monroe (or anyone else

investigating the case) sought legal advice regarding the supposed 48-hour rule before attaching the GPS trackers to the defendants' truck.

6. I served for 16 years as an Assistant United States Attorney in the criminal division in Northern District of California. I served in the Organized Crime Section for over 10 years and was Chief of the General Crimes Section. In my experience, I never heard of a border exception permitting the warrantless installation of a GPS tracking device or some sort of 48-hour rule. Consequently, in investigating the use of such a device in this case, I asked a retired United States Customs and ICE agent with over 30 years of experience (he retired in 2017) if he was familiar with a rule or "understanding" permitting warrantless installation of GPS devices at the border. The retired agent told me that he had never heard of this claimed interpretation of the border search exception. Moreover, he later contacted me and told me that he asked several other agents he had worked with about this purported "48-hour rule" or "commercial vehicle rule." He advised me that no one had heard of this "48-hour rule" or the "commercial vehicle exception" as stated in the Monroe and Mkrtchyan declarations.

7. In an effort to determine the basis for SAs Gernatt and Abair "understanding" and whether it was supported by any legal opinion or government policy I searched the United States Attorney's Manual prepared by the United States Justice Department. I did not find the purported "rules" claimed by SA Garnett or SA Abair.

8. On June 7, 2018, I sent a discovery request to the government asking for (1) any DOJ, FBI, ICE, and CPB policies, memoranda, opinions, training manuals, and guidelines which are provided, authored or used by these

agencies that pertain to the installation and use of GPS tracking devices both at border and inside it; (2) whether any law enforcement agents or officers involved in this case contacted any government lawyer (including AUSAs, US or State DOJ attorneys, District Attorneys or in house agency legal advisors) regarding the legality of the warrantless placement of GPS tracking devices on the defendants' semi-truck and trailer;  (3) who or what SA Gernatt and Abair relied upon in claiming to Monroe and Mkrtchyan their "understanding" as to the legality of the warrantless GPS installation at the border of our clients' truck and trailer, as well as the alleged 48-hour "rule" and non-application of the "rule" to commercial vehicles; and (4) whether SA Monroe or Detective Mkrtchyan independently did anything to verify, confirm or follow up on SA Gernatt and Abair's belief regarding warrantless GPS tracker installation at the border, the 48-hour "rule," or the commercial vehicle exception.

9. On June 14, 2018, the government responded to my June 7, 2018 discovery request, summarized above, and stated that if any such materials existed, the government believed it was not obligated to produce them.

10. As stated in her declaration in paragraph 17, on October 30, 2017, FBI SA Monroe applied for a search warrant to access a Moto cell phone found and seized by the investigators from the defendants' truck on October 23, 2017. Attached hereto as Exhibit B is an excerpt from SA's statement of probable cause for that search warrant. As seen in that excerpt, while SA Monroe describes that the defendants' truck was inspected at the Port Huron border, she makes no mention of the fact that the government placed GPS tracking devices on the truck and trailer without a warrant.  *See* Exhibit B, page 3

highlighted paragraph 29). She also made no mention of monitoring the defendants via the warrantless GPS tracking devices.  Furthermore, agent Monroe omits in her paragraph 17 the information that officer Mkrtchyan had previously, while detaining the defendants at the Cowboy Burger restaurant, had accessed the same Moto phone *without a warrant* and obtained the identical information. In fact, officer Mkrtchyan photographed the contents of the Moto phone and included this in his report.  *See* page 11 of Officer Mkrtchyan's declaration (Dkt 87-2); also referred to as Bates # 632.

11.  Upon review of the declarations of SA Monroe and Mkrtchyan, based upon my investigation into this case, the following salient facts are conspicuously absent from their summaries:

a)  While SA Monroe admits that Bo-Mak is a small trucking company in Canada, she omits that Bo-Mak was making legitimate cargo runs in March and October 2017 in California for the same client.  Defendant Karac had a full load of frozen pastries set to be delivered to a Starbucks in La Puente, California in his trailer when he was arrested in March 16, 2017. Because the trailer was impounded with its full load undelivered, Mr. Ignatov, the owner of Bo-Mak, had to locate his missing driver (who had been arrested) and then attempt to save the load of pastries from spoiling. Consequently, Mr. Ignjatov's March 2017 trip to California was to save the load of pastries and retrieve the impounded truck and trailer. Moreover, because defendants Ignjatov and Hristovski were carrying a load of frozen pastries for delivery to the same Starbucks in La Puente,

California in October 2017, their truck was in the same general locations as Karac in March 2017.

b) Attached hereto as Exhibit C is a copy of the Bo-Mak shipping manifest showing that the defendants were delivering Cheese Danish, Banana Bread, and other items to QCD (a Starbucks distribution facility) located at 14317 Lomitas Avenue in La Puente, California

c) While SA Monroe claims that defendant Ignjatov was allegedly recorded talking to an informant about drugs in New York in 2014, she omits from her summary the additional information that Mr. Ignjatov was never arrested or charged based upon this allegation.  In fact, this New York investigation resulted in two federal indictments in the Southern District of New York in 2015 and 2016 with at least three defendants who were prosecuted. Upon my review of the discovery in this case, and using PACER, the first New York case was filed as CR-15-322 and consisted of two defendants named Mladen Lukic and Milos Antic. The second New York case was filed as CR-16-540 and involved defendant Jose Carvajal.  Apparently, there was no real cocaine in this 2014 New York investigation.  The defendants in the two New York cases were charged with attempted importation / exportation of narcotics.

d) While SA Monroe speculates that, during the May 2017 to June 2017 cooperation with CHS-1, references to the word "brother" and "brothers" refers to defendant Ignjatov because he is defendant Karac's brother-in-law, she omits the repeated references to other "brothers" whom she learned about during the investigation. First, defendant Karac actually has a biological brother whom he identified to law enforcement at the

time of his arrest. *See* report attached as Exhibit D. As seen in Exhibit D, page 2, in the section I highlighted, Karac told the interviewing officer that he had a brother who works for the same trucking company and was a trucker in the past.  Karac's brother apparently has a friend who stole a drug load from a drug organization.  Karac also described how he met someone named "Mark" at a bar.  "Mark" later told Karac that his brother transported drugs for a drug organization and because Karac's brother's friend stole from the drug operation, Karac would have to transport drugs to ensure the safety of his family. Nowhere in this interview is Slavco Ignjatov mentioned, much less is he described as having any involvement in the drug transportation activity of Karac or his brother.

e) In addition to the fact that SA Monroe knew Karac had a brother involved in the drug transportation ring, she also learned from CHS-1, according to her May 10, 2017 interview provided in discovery, that the drug organization involved other sets of brothers and that the members of the organization often referred to each other as "Bro" or "Brother." CHS-1 told SA Monroe that the BOSS of the drug ring was using the "Wonk brothers" to help with the new Chicago transport and that the Wonks previously shipped cocaine to Chicago. The Wonk brothers, according to CHS-1, wanted to start shipping again because they needed money.

f) CHS-1 also told SA Monroe about a worker for the Boss named "Little Bro" who transported 50 to 90 kilos at a time. Bro, according to CHS-1, has coordinated several shipments for the Boss and has a brother named "Bobby" who not only knows the Boss but has been investigated for cocaine trafficking;

g) While SA Monroe speculates that the Bo-Mak trucking company was traveling to California on October 20, 2017 to make a "dry run" or transport drugs, she omits the fact that she was told on March 19, 2017 by a CHS that the drug organization she was investigating no longer intended to use this trucking company (Bo-Mak) as a distribution method.  *See* Exhibit E, page 2, highlighted section.

h)  In fact, in two subsequent search warrants, on May 10, 2017, in Long Beach and Redondo Beach, SA Monroe stated in her declaration that according to recorded conversations, Karac was blamed for the seizure of the 194 kilos of cocaine and the organization sought to replace "those shippers" with more reliable people.  To that end, the organization contacted the shippers who previously shipped drugs.  See Exhibit F, highlighted excerpts of two search warrant declarations authored by SA Monroe.

i) SA Monroe did not include in her summary the fact that informants in this case mentioned several other trucking companies used by the Boss in the drug operation. For example, informants told her and other FBI agents about other trucking companies used by the organization to transport cocaine named "Daylight Transport" and "Focus Transport";

j) SA Monroe did not include the fact that many of the text messages she observed repeatedly made references to each other as "brother" or "Bro." Attached as Exhibit G are a sample of some of these text messages;

k) SA Monroe did not include the fact that many of the text messages she observed repeatedly made references to the Wonk brothers and their involvement in the drug organization. Attached as Exhibit H are a sample

8

of some of these text messages discussing the Wonks, their willingness to "work" and shipments.

12. The government's discovery included law enforcement communications pertaining to the monitoring of the GPS tracking devices from the warrantless installation at Port Huron on October 20, 2017 to the defendants' arrest on October 28, 2017 back at Port Huron. From a reading of these communications it is clear that law enforcement tracked the defendants across the country over thousands of miles continuously for over eight days primarily only using the GPS electronic monitoring device. Although law enforcement may have used visual surveillance for the relatively brief period when the truck and trailer were in the Los Angeles area on October 22 to October 23, 2017 it is clear that the GPS tracking device was still being used to aid in the surveillance. SA Monroe admits in her declaration to relying on the GPS device regardless of any ongoing visual surveillance. Also, in text messages, it appears that the surveilling agents were "alerted" when there was movement of the truck and trailer as detected by the GPS monitoring device. Also, it appears that law enforcement increased the capability of the electronic monitoring by the GPS device as the truck and trailer came near to the area of where the visual surveillance team was waiting. In other words, the GPS "pinging" was increased to occur more frequently as it was in the Los Angeles area. Attached hereto as Exhibit I are excerpts of some of the communication following the GPS monitoring on the defendants' truck and trailer indicating being alerted to the truck's movement, the increased "pinging" and the over weeklong electronic surveillance of the truck and trailer by the GPS device.

13. On October 23, 2107, the surveillance team observed a dark vehicle with paper plates stop and the meet with the Bo-Mak truck and trailer. The occupant of that vehicle allegedly delivered the sugar later found in the defendants' truck. Although several surveillance agents were at the scene, they apparently lost track of the dark vehicle with paper plates. Unlike the truck and trailer, the dark vehicle did not have a GPS tracking device.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June 2018, in San Francisco, California.

DATED:   June 18, 2018

/s/ Steven Gruel
STEVEN F. GRUEL