UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CRIMINAL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCR 17-222(A) JGB** | Date | August 24, 2018 |
| Title | *United States of America v. Slavco Ignjatov, et al.* | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for government: | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **Order GRANTING Defendants' Motion to Suppress (Dkt. No. 86) (IN CHAMBERS)**

Before the Court is Defendants Slavco Ignjatov and Valentino Hristovski's (collectively, "Defendants") motion to suppress evidence. ("Motion," Dkt. No. 86.) On June 25, 2018 and July 9, 2018, the Court held hearings on the Motion. After considering the oral argument and papers filed in support of, and in opposition to, the Motion, the Court GRANTS the Motion.

## I.   BACKGROUND

Defendants Ignjatov and Hristovski were charged in the first superseding indictment with conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. ("Indictment," Dkt. No. 53.) The Indictment alleges that Ignjatov and Hristovski, along with Djordje Karac, an unknown individual, and two unindicted individuals conspired to "knowingly and intentionally distributed and possess with intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine." (Indict. at 1-2.)

On May 11, 2018, Defendants moved to suppress evidence obtained by the government after placing a Global Position System Device ("GPS") on their truck. (Mot. at 1.) The government opposed the Motion on May 21, 2018. ("Opposition," Dkt. No. 87.) Defendants replied on June 18, 2018. ("Reply," Dkt. No. 95.)

The Court held two evidentiary hearings for the Motion. On June 25, 2018, Special Agent Hannah Monroe testified, and on July 9, 2018, Special Agent Monroe and Special Agent Asatur Mkrtchyan testified. The Court also heard oral argument on July 9, 2018. The parties submitted

supplemental briefing on August 9, 2018.  ("Gov't Supp. Brief," Dkt No. 116; "Defs. Supp. Brief," Dkt. No. 117.)

## II. FACTS

The Indictment alleges Karac entered the United States at Port Huron, Michigan from Canada on March 11, 2017, driving a Bo-Mak truck.  (Indict. at 3.)  On March 16, 2017, in Mira Loma, California, Karac met a co-conspirator who gave Karac ten duffle bags containing approximately 193.7 kilograms of a substance containing cocaine, which Karac loaded onto the Bo-Mak truck.  (Id.)  On March 16, 2017, law enforcement officers seized the 193.7 kilograms of the substance and an encrypted Blackberry device from the Bo-Mak truck Karac drove.  (Id. at 4.)

On March 19, 2017, using "coded language during a recorded telephone conversation," Karac advised Ignjatov that a drug-detection police dog alerted to his Bo-Mak truck on March 16, 2017 at the time of the seizure.  (Id.)  Also on March 19, 2017, a co-conspirator told another individual, who was a confidential Federal Bureau of Investigations ("FBI") source that they needed to do a dry run using flour or a similar substance.  (Id.)

On March 21, 2017, Ignjatov picked up Karac's Bo-Mak truck from the towing company where it was stored following the March 16, 2017 seizure.  (Id. at 4-5.)  Then, in April 2017 and May 2017, on several occasions, co-conspirators discussed the need to conduct dry runs and that two dry runs had been completed successfully.  (Id. at 5.)

On October 19, 2017, Customs and Border Patrol ("CBP") notified Special Agent Hannah Monroe that Defendants were entering the United States from Canada through Port Huron, Michigan in a Bo-Mak semi-truck, and the trailer plate matched the one Karac used when transporting cocaine in March.  (Opp'n at 7.)  Monroe and Special Agent Jack Gernatt spoke about applying GPS trackers to Defendants' truck, along with Los Angeles Police Department officer Asatur Mkrtchyan and Special Agent Van Dyke.  (June 25, 2018 Hr.)

The Indictment further alleges that on October 20, 2017, Ignjatov and Hristovski entered the United States from Canada driving a Bo-Mak truck "to conduct a dry run on the route that defendant Karac had previously used to transport cocaine."  (Id. at 6.)  At the border in Port Huron, Michigan, Homeland Security Investigations Border Enforcement Security Task Force ("HSI BEST") and/or a CBP agent applied two GPS devices to the truck and trailer.  (Mot. at 5; Opp'n at 8.)  HSI agents also inspected the truck at the border but found nothing unusual.  (Id.)

The government used a program called Covert Tracker to track the GPS devices.  (See June 25, 2018 Hr.)  The program permits agents to sign on from any location to verify the GPS location data.  (Id.)  In addition to obtaining a nearly exact address, Covert Tracker records the speed the vehicle.  (Id.)  The intervals at which Covert Tracker records data from the GPS devices can be changed, and here it was set to approximately fifteen minute intervals then increased as Defendants approached California.  (Id.; July 9, 2018 Hr. Tr. at 64, Dkt. No. 118-1.)

Covert Tracker also keeps all historic location data, which agents can see upon signing-in, and allows agents to download the data into Excel. (Id.)

Investigators tracked the GPS devices until approximately 4:45 p.m. on October 22, 2017, and located and observed the truck in San Bernardino, California. (Opp'n at 8; Mot. at 5.) Thereafter, the investigators maintained continuous physical surveillance of the truck. (Opp'n at 8.) The agents checked the GPS location information once or twice during the night after starting physical surveillance. (July 9, 2018 Hr. Tr. at 30.)

On October 23, 2017, in Mira Loma, California, a co-conspirator gave Defendants a duffle bag containing approximately sixty pounds of sugar that Defendants loaded into the Bo-Mak truck. (Indict. at 6.) That same day, they drove to the same restaurant parking lot where Karac had previously stopped while transporting cocaine. (Id. at 6-7.) Los Angeles Police Department ("LAPD") detectives detained Defendants, and Ignjatov consented to a search of the truck. (Opp'n at 9.) The detectives located the duffel bag, and found 15 four-pound packages of C&H sugar. (Mot. at 5.) A drug-detection dog alerted to the presence of the odor of narcotics on the duffle bag. (Opp'n at 9.) Hristovski possessed an encrypted Blackberry device in his pocket, but both Ignjatov and Hristovski denied any connection to the device. (Id. at 6-7; Mot. at 5.)

Defendants were not arrested the day of the search. (Mot. at 6.) Instead, on the night of October 28, 2017, as Defendants attempted to return to Canada from Port Huron, Michigan, HSI Special Agent Greg Abair arrested them for conspiracy to traffic cocaine. (Id.) The GPS trackers remained on Defendants' truck and trailer for approximately eight days, until their removal in Port Huron when Defendants were arrested. (June 25, 2018 Hr.)

### III. LEGAL STANDARD

"Aliens inside the U[nited] S[tates] . . . are entitled to certain constitutional protections unavailable to those outside our borders." Kwai Fun Wong v. United States, 373 F.3d 952, 971 (9th Cir. 2004). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." California v. Acevedo, 500 U.S. 565, 580 (1991) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)).

What is reasonable depends on the circumstances surrounding the search and the nature of the search itself. United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). The reasonableness of a search is determined by balancing "the degree to which it intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, 119 (2001). The government bears the burden of providing that a warrantless search or seizure falls within an exception to the warrant requirement. United States v. Job, 871 F.3d 852, 860 (9th Cir. 2017).

The exclusionary rule operates to exclude unlawfully seized evidence in a criminal trial. Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016). The exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality." Id. (internal quotations omitted). The suppression of evidence retrieved from constitutional violations pursuant to the exclusionary rule functions to "deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, at 236-37 (2011). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" Id. at 237 (quoting United States v. Janis, 428 U.S. 433, 454 (1976)). Thus, for exclusion to be appropriate, "the deterrence benefits of suppression must outweigh its heavy costs." Id.

When the police exhibit "deliberate, reckless, or grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion tends to outweigh the resulting costs. Id. at 238. Conversely, when the police act with an "objectively reasonable good faith belief" that their conduct is lawful, or when their conduct involves "only simple, isolated negligence," exclusion is unwarranted. Id. (internal citations omitted).

## IV. DISCUSSION

Defendants assert the government's warrantless application of the GPS devices and monitoring of Defendants' truck violated their Fourth Amendment rights. (Mot. at 6.) The government argues the installation and use of the GPS devices were lawful, and even if not, the evidence is admissible under the attenuation, inevitable discovery, and good faith exceptions to the exclusionary rule. (See Opp'n.) The application of a GPS tracking device at a border appears to be a matter of first impression in this Circuit. Thus, the Court considers first whether the installation and use of the GPS devices violated Defendants' Fourth Amendment rights, and then the implications of the exclusionary rule.

### A. Installation and Monitoring of the GPS Devices

The Supreme Court has held that the government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search within the meaning of the Fourth Amendment. United States v. Jones, 565 U.S. 400, 404 (2012). In Jones, government agents installed a GPS device on a Jeep while it was parked in a public parking lot. 565 U.S. at 403. Over the subsequent twenty-eight days, the government used the device to track the vehicle. Id.

The Court first explained its Fourth Amendment jurisprudence was historically a property-based approach, until Katz v. United States, 389 U.S. 347 (1967), which broadened the analysis to include reasonable expectations of privacy. Id. at 405-06. However, in Jones, because the defendant possessed the Jeep at the time of the physical intrusion, the Court applied the trespassory test instead of the Katz reasonable expectation of privacy test. Id. at 409. Applying a common-law trespassory test, the Supreme Court noted the government had "physically occupied private property for the purpose of obtaining information" by affixing the device, and

by "attaching the device to the Jeep, officers encroached on a protected area." Id. at 404, 410. Moreover, the Court noted that "where a classic tresspasory search is not involved," the Katz analysis may be relied upon in grappling with the length of searches and nature of crime being investigated. Id. at 412-14. The Supreme Court also explicitly did not consider the government's argument that the use of the device was reasonable and lawful under the Fourth Amendment because the officers had reasonable suspicion and probable cause because it was not raised before the D.C. Circuit. Id. at 413.

Here, the government placed GPS tracking devices on Defendants' Bo-Mak truck and trailer without a warrant, and monitored the devices' information for approximately a day and a half. Nevertheless, the government argues the installation of the GPS devices was permitted under the border search exception to the Fourth Amendment. (Mot. at 15-17.)

   1. **Border search exception**

Border searches form "a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." United States v. Cotterman, 709 F.3d 952, 960 (9th Cir. 2013) (quoting United States v. Seljan, 547 F.3d 993, 999 (9th Cir. 2008). "The [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." United States v. Flores-Montano, 541 U.S. 149, 152 (2004). Thus, the Fourth Amendment balance of interests leans heavily to the government at a border. Montoya de Hernandez, 473 U.S. 531, 544 (1985).

Concerning searches of the person, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant" at a border. Montoya de Hernandez, 473 U.S. at 538. On the other hand, some searches beyond the scope of a routine customs search, such as alimentary canal searches, require reasonable suspicion. Id. at 541. However, the Supreme Court also noted that the reasons requiring some level of suspicion for "highly intrusive searches of the person . . . simply do not carry over to vehicles." Id. at 152. Still, "some searches of property are so destructive," or "particularly offensive," as to require particularized suspicion. Id. at 154 n.2, 156.

The initial GPS installation on the Defendants' Bo-Mak truck and trailer occurred at an international border. Thus, the key to determining whether the search required reasonable suspicion depends on the intrusiveness of the vehicle search. Cotterman, 709 F.3d at 962. In the context of vehicle searches, the threshold of what constitutes an unreasonable search because of the "offensive" manner in which it is carried out remains an open question. Flores-Montano, 541 U.S. at 154 n.2. The Ninth Circuit has established two factors to consider in assessing whether a border vehicle search requires reasonable suspicion, "(1) did the search damage the vehicle in a manner that affected the vehicle's safety or operability, and (2) was the search conducted in a particularly offensive manner." United States v. Guzman-Padilla, 573 F.3d 865, 879 (9th Cir. 2009), cert denied Guzman-Padilla v. United States, 562 U.S. 949 (2010) (quoting United States v. Cortez-Rivera, 454 F.3d 1038, 1042 (9th Cir. 2006)).

In Flores-Montano, the Supreme Court held the driver had no expectation of privacy in the contents of the vehicle's gas tank, and then noted the disassembly and reassembly of the fuel tank did not result in serious damage or destruction of the property. 541 U.S. at 154. The Court concluded the disassembling and reassembling of a vehicle's gas tank was not an intrusive enough search as to require reasonable suspicion to believe the tank contained contraband. 541 U.S. at 155. Relying on Flores-Montano, the Ninth Circuit held the suspicionless slashing of a vehicle's spare tire during a border search was not so destructive as to be unreasonable. United States v. Cortez-Rocha, 394 F.3d 1115, 1119 (9th Cir. 2005). The court explained that cutting the tire was damaging to the tire, but did not "affect or undermine the vehicle's operation or safety" or the safety and security of the vehicle's occupants. Id. at 1120. Soon after, the Ninth Circuit considered the suspicionless drilling of a 5/16 inch hole in the bed of a pickup truck at a border in United States v. Chaudry, 424 F.3d 1051, 1053 (9th Cir. 2005). The court found the hole drilled did not cause significant damage or destruction of the vehicle, nor did it undermine or threaten the safety of the vehicle's riders. Id. at 1053-054. The Ninth Circuit also determined the drilling was not carried out in an offensive manner; accordingly, the search did not require reasonable suspicion. Id. at 1054. Similarly, the Ninth Circuit has also upheld the suspicionless prying open of a vehicle's interior door despite the resultant damage to the panel. Cortez-Rivera, 454 F.3d at 1042-1043; see also United States v. Hernandez, 424 F.3d 1056, 1059 (9th Cir. 2005) (authorizing the suspicionless "gentle removal" of vehicle's interior door panel)). Conversely, the Ninth Circuit required reasonable suspicion for using a spike strip to deflate a vehicle's tires, finding "the damage factor alone [] decisive because Appellant's vehicle was rendered inoperable." Guzman-Padilla, 573 F.3d at 879.

Here, the placement of the GPS device on Defendant's truck did not result in any damage to the vehicle or affect its operability. Defendants drove the truck from Michigan to California, and there is no indication their safety or security was jeopardized by the installation of the GPS devices. Thus, the government argues, the absence of damage establishes the permissiveness of this suspicionless vehicle search. (Opp'n at 17.) In a case also involving a technological search tool, the Ninth Circuit upheld a suspicionless border search in which officers used a radioactive density meter called a "Buster" to search the inside of a spare tire. United States v. Camacho, 368 F.3d 1182 (2004). The court found Buster searches do not cause damage to the property at which they are aimed, nor was there evidence that any of the motorists were exposed to potentially harmful levels of radiation from a Buster search. Id. at 1185-186.

Flores-Montano and subsequent Ninth Circuit border vehicle search cases focus on whether the government's search resulted in physical damage or destruction to the vehicle at issue. Thus, under these cases, the installation of the GPS systems, conducted without affecting Defendants' vehicle's operability or safety, could plausibly have been undertaken without requiring reasonable suspicion. However, the border vehicle search cases all involved searches conducted and completed at the border, which have "minimal or no impact beyond the search itself." Cotterman, 790 F.3d at 966. The Court doubts that an analysis dependent on the physical aspects of the search is appropriate here where the search extends beyond the initial installation of the GPS device.

Defendants liken the GPS installation to the forensic laptop search in Cotterman. In Cotterman, border customs agents searched a laptop, then made copies of the hard drives and performed forensic evaluations on the computer in the following days. 709 F.3d at 966. The Ninth Circuit first held the subsequent forensic examination was not an extended border search, although the computer had been transported and examined over 100 miles from the border, because the laptop had never cleared customs, so its entry was never effected. Id. at 961-62. The court also held the initial manual search was justified, but the subsequent "exhaustive forensic search" was "essentially a computer strip search," and required reasonable suspicion to be undertaken due to the "substantial intrusion upon personal privacy and dignity." Id. at 962, 966, 968.

While the placement of a GPS device on a vehicle falls short of an intrusion "akin to reading a diary line by line" considered in Cotterman, the Court concludes the data collection inherent in GPS monitoring exceeds the scope of the suspicionless searches authorized in the border vehicle cases. Cotterman, 709 F.3d at 962. Surreptitious surveillance of an individual's movements through placement of a GPS device on a vehicle implicates far greater privacy concerns than the physical integrity of the vehicle, and extends beyond the permissible scope of a border search. The border search cases, permitting routine searches of persons and their effects without reasonable suspicion, probable cause, or a warrant, "reflect longstanding concern for the protection of the integrity of the border." Montoya de Hernandez, 473 U.S. at 528. Concerns such as the prevention of contraband from entering the country, Flores-Montano, 541 U.S. at 153, and "national self-protection," Carroll v. United States, 267 U.S. 132, 154 (1925), motivate the looser Fourth Amendment requirements at the border. The border search exception is "grounded in the recognized right of the sovereign to control . . . who and what may enter the country." United States v. Ramsey, 431 U.S. 606, 620 (1977). Thus, border searches have been considered reasonable "by the single fact that the person or item in question had entered into our country from the outside." Id. at 619.

Nonetheless, the underlying rationale of the border search doctrine reflects its limitations. The Supreme Court has observed that "[i]mport restrictions and searches of person or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations." United States v. 12 200-Ft. Reels of Film, 413 U.S. 123, 125 (1973). Once the entity at issue is beyond the border, the concerns animating the border search doctrine, namely the integrity of the border, diminish, and the robust Fourth Amendment requirements adhere.

The placement of a GPS device at the border necessarily implicates a search away from the border, once the target has gained entry into the country. As Justice Alito noted in his concurring opinion in Jones, the Court defined the search as encompassing both the installation and use of the GPS, rather than separating the procedures. Jones, 565 U.S. at 420 (Alito, J., concurring). Therefore, this Court is hesitant to mechanically apply the border search doctrine where the search stretches far beyond the conduct at the border to create a "precise comprehensive record of a person's public movements." Id. at 415 (Sotomayor, J., concurring). Ultimately, the Court concludes the placement of a GPS device on a vehicle at the border, combined with the

subsequent tracking of data over a prolonged period away from it, cannot be justified by the border search exception.

### 2. Extended border search

Since the Court finds the border search exception does not apply to the search here, the Court considers how the subject search should be classified. Though the government does not counter this point, Defendants argue the extended border search exception does not justify the search. (Mot. at 13.) The Court agrees the placement of the GPS device and monitoring of its data cannot be justified as an extended border search.

Extended border searches are searches "away from the border where entry is not apparent." United States v. Corral-Villavicencio, 753 F.2d 785, 788 (9th Cir. 1985). These searches are typically separated from the border by "a greater spatial and temporal distance" from the actual border. United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007). In the Ninth Circuit, extended border searches must meet the "dual requirements of reasonable certainty of a recent border crossing and reasonable suspicion of criminal activity." Guzman-Padilla, 573 F.3d at 878-79. Moreover, an initial search at a border crossing does not preclude a subsequent search from being an extended border search. United States v. Alfonso, 759 F.2d 728, 735 (9th Cir. 1985.)

While the initial placement of the GPS devices on Defendants' truck occurred at the border, the subsequent monitoring of the data over the almost 48 hours constitutes a continuous search. See Jones, 565 U.S. at 420 (Alito, J., concurring). The monitoring of the devices occurred for less than 48 hours, yet it is this unceasing search over that period that precludes application of the extended border search doctrine. Typically, extended border search cases feature a defined search that is conducted at some distance from the border. For example, in Rodriguez-Gonzalez, 378 F.2d 256, 258 (9th Cir. 1967), the Ninth Circuit upheld customs officers' search of a vehicle fifteen hours and twenty miles after it crossed the Mexican border. See also Guzman-Padilla, 573 F.3d at 878 (collecting extended border search cases).

The search here differs significantly from a typical extended border search. Over the almost 48 hours the government agents tracked Defendants' truck and trailer, the Covert Tracker program obtained Defendants' location information at regular intervals. (June 25, 2018 Hr.) Moreover, Covert Tracker permits the government agents to download all historic location information from the devices, which they did. (Id.) Such tracking is poles apart from the discrete searches conducted under the extended border search doctrine. Accordingly, the Court concludes the search of Defendants' truck from the placement and monitoring of the GPS device cannot be classified as an extended border search.

### 3. Reasonableness

If the search of Defendants' truck cannot be classified as a border search or an extended border search, then it is only valid if the warrantless search was reasonable under the Fourth Amendment.

The government argues the short-term monitoring of the GPS data is reasonable and permissible under Jones. (Opp'n at 23.) However, the government's argument rests on the assumption that "there was no unlawful trespass here pursuant to the border search doctrine." (Id.) The Court has already concluded the search here is not subject to the border search or extended border search doctrines, and therefore the lawfulness of the trespass cannot be based on either of these doctrine. The government argues the case is like United States v. Knotts, 460 U.S. 276 (1983), which held that the use of an electronic device to monitor a vehicle's movements on public roads without a trespass is permissible under the Fourth Amendment. (Opp'n at 23.) However, the Supreme Court expressly distinguished Knotts from the facts in Jones because Knotts did not involve a trespass as the beeper device was placed in a container with its owner's consent, prior to being placed in the tracked automobile. Jones, 565 U.S. at 409. As in Jones, the surreptitious installation of the GPS trackers on Defendants' truck and trailer constituted a physical trespass and, accordingly, Knotts is inapposite.

Whether a search is reasonable is "determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 118-119. GPS tracking can reveal much about a person's life. See United States v. Maynard, 615 F.3d 544, 562 (D.C. Cir. 2010) (noting the considerable information the government can learn about a person through GPS surveillance). As the Supreme Court recently recognized of GPS information, "time-stamped data provides an intimate window into a person's life." Carpenter v. United States, --S. Ct. --, 2018 WL 3072916, at *9 (June 22, 2018). Moreover, as individuals not on parole or probation at the time the GPS tracking device was placed on their truck, Defendants enjoyed "absolute liberty." Knights, 534 U.S. at 119. Accordingly, the Court concludes Defendants' privacy interests were significant.

The government argues the intrusion on Defendants' privacy interests was limited because the GPS devices were monitored for less than 48 hours. (Opp'n at 23.) While the surveillance in Jones took place over four weeks, the Court cannot conclude this shorter period of monitoring was reasonable as a matter of law. The Court determines the warrantless search at issue here was not reasonable. See Carpenter, --S. Ct. --, 2018 WL 3072916, at *13 ("[I]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.").

**B.  Exclusionary Rule**

The government argues the evidence obtained is admissible under the attenuation and inevitable discovery exceptions to the exclusionary rule. (Opp'n at 10-14.) Lastly, the government argues the good faith prevents the application of the exclusionary rule. (Opp'n at 24.) The Court considers each argument in turn.

      **1. Attenuation**

Evidence obtained after official misconduct may still be admitted if it satisfies the attenuation doctrine. <u>United States v. Gorman</u>, 859 F.3d 706, 718 (9th Cir. 2017). The attenuation doctrine seeks to determine whether "the connection between the illegality and the challenged evidence has become so attenuated as to dissipate the taint caused by the illegality." <u>United States v. Ramirez-Sandoval</u>, 872 F.2d 1392, 1396 (9th Cir. 1989) (citation omitted). When considering whether evidence obtained from official misconduct satisfies the attenuation doctrine, the court considers: (1) the temporal proximity between the unconstitutional conduct and the discovery of the evidence to determine how closely the discovery of evidence followed the unconstitutional search; (2) the presence of intervening circumstances; and (3) with particular significance, the purpose and flagrancy of the official misconduct. <u>Utah v. Strieff</u>, 136 S. Ct. 2056, 2062 (2016).

In the instant case, the time elapsed between the installation of the GPS and the discovery of the evidence was not long enough to create sufficient attenuation. In <u>United States v. Hermiz</u> 42 F. Supp. 3d 856 (E.D. Mich. 2014), the court determined that the time lapse of approximately five days between the installation of the GPS device and the stop and 1discovery of the evidence weighed in favor of suppression. Hermiz was suspected of smuggling marijuana to and from Canada from an abandoned house near the Canadian border. <u>Id.</u> at 860. Officer Joyner installed a warrantless GPS tracker on an automobile rented by Hermiz and two "geo-fences" that would alert him as to when Hermiz left his residence and approached the abandoned house. <u>Id.</u> at 862. Four days after the GPS tracker had been placed, it alerted Officer Joyner that Hermiz was approaching the abandoned house. <u>Id.</u> Subsequently, Officer Joyner ordered law enforcement to set up surveillance around the house. <u>Id.</u> That evening, law enforcement witnessed an individual cross the St. Clair River from Canada and exchange duffle bags with Hermiz. <u>Id.</u> The next morning, an individual named Korkis arrived at the abandoned house. <u>Id.</u> Shortly thereafter, Korkis and Hermiz left the abandoned house in separate automobiles. <u>Id.</u> Law enforcement conducted the stop as Korkis and Hermiz drove away and found forty pounds of marijuana in Korkis's automobile. <u>Id.</u> The court reasoned that pursuant to <u>Jones</u>, "both the installation and the use of the device to monitor the vehicle's movements constitute 'the search.'" <u>Id.</u> at 869. Thus, the temporal proximity between the search and the stop of the vehicles was limited and weighed against attenuation. <u>Id.</u>

Here, three days passed between the installation of the GPS tracking device and the stop of the Bo-Mak truck and discovery of the evidence. As in <u>Hermiz</u>, law enforcement agents used the GPS device to monitor the location of Defendants until approximately 4:45 p.m. the day before the stop. Overnight, Monroe also accessed the location data to verify the truck and trailer's location. Therefore, not even a full day passed between the monitoring of the GPS data and the stop and search of Defendants' truck and trailer. This time period does not establish sufficient attenuation.

Second, the Court finds there are no intervening circumstances to attenuate the installation of the GPS device and the discovery of the evidence. In cases where a court has determined the existence of intervening circumstances, independent events led to the discovery of evidence.

The government urges the Court to follow the rationale in United States v. Martin, 712 F.3d 1080 (7th Cir. 2013), a case in which the Seventh Circuit considered whether the installation of a GPS device on the defendant's vehicle was sufficiently attenuated from the subsequent search of his car. (Gov't Supp. Brief at 3.) In Martin, after a bank robbery, police officers received a tip Martin was one of the robbers and placed a GPS device on his car. 712 F.3d at 1081. The police tracked Martin into Illinois, where a local deputy stopped and searched his car and found drugs and a revolver. Id. The court noted the GPS data "simply [ ] aided law enforcement officials in tracking down Martin when they decided to effect his arrest." Id. at 1082. Then, the court stated it was a "quite different" situation than in Jones, where the GPS data was used "to establish a necessary link between the defendant and a cocaine stash house." Id. Thus, because the officers had probable cause for Martin's arrest, reasonably believed the vehicle contained evidence of the bank robbery, and the evidence to be suppressed had "little to do with the fact that a GPS device had been used at all," the court held it was significantly attenuated from the improper installation of the device. The government argues other cases in which the courts have not suppressed evidence that stemmed from improper GPS devices similarly involved GPS data used only to locate the defendant. See, e.g., United States v. McLayea, 2014 WL 931882, at *4 (S.D. Ind. Mar. 7, 2014) (denying suppression of marijuana after officer attached two GPS devices to defendant's van without a warrant, tracked the vehicle for two weeks, and then obtained defendant's location and executed a traffic stop because "there [wa]s no connection between what the GPS data revealed . . . and McLayea's eventual traffic stop other than that the second GPS device gave [the officer] McLayea's location.").

The government also argues courts have suppressed evidence when the GPS data was used to link the target to the crime, citing United States v. Lee, 862 F. Supp. 2d 560 (E.D. Ky. 2012). (July 9, 2018 Hr. Tr. at 190.) Defendants, meanwhile, assert the present case is more analogous to Lee than Martin. (Reply at 4.) In Lee, Drug Enforcement Administration ("DEA") agents were informed that Lee obtained marijuana in Chicago and transported it back to eastern Kentucky in his car. 862 F. Supp. 2d at 562. A DEA agent attached a warrantless GPS tracker to Lee's car that transmitted his location in real time. Id. Three days after installing the device, DEA agents noticed Lee had driven to Chicago and when his vehicle began traveling back towards Kentucky, they contacted local police to intercept him and told them to develop probable cause before stopping Lee. Id. The Kentucky officer observed Lee not wearing his seatbelt and pulled him over. Id. at 563. Lee consented to the officer searching the vehicle, and the officer along with another officer used police dogs to search the vehicle. Id. The dogs alerted to the presence of contraband, and the officers found approximately 150 pounds of marijuana. Id. The court found insufficient attenuation in part because the officer's ability to observe Lee's seatbelt "clearly related" to the illegal search, and without the warrantless GPS tracking, he would not have known where or when to find Lee or that he should develop probable cause to stop him. Id. at 566. The Lee court also noted that the DEA agents installed the GPS device on Lee's car in hopes that something might turn up, and when suspicious behavior occurred, they contacted Kentucky police, "set[ting] in motion a chain of events that ended with Lee's arrest." Id. at 567.

Here, the government agents relied on the GPS data to determine Defendants' location on October 22, 2017 and begin physical surveillance. Defendants argue the GPS data is intertwined with the physical surveillance observations and is not independent. (Defs. Supp. Brief at 4.) Although the government argues the GPS data had no independent evidentiary value, (Gov't Supp. Brief at 3), the agents suspected Defendants were engaged in unlawful activity in part because their route was similar to Karac's. The similarity of the routes was established by the GPS device. The GPS data served as corroboration for the agents' belief in their need to physically surveil Defendants for illegal activity, because the Defendants entered through Port Huron in a Bo-Mak truck and ended up in the same California locale as Karac. Thus, the observation of the duffle bag exchange would have been nearly meaningless, considering Defendants drove a delivery truck, absent the corresponding GPS data that bolstered the link between Defendants and Karac. Moreover, unlike in Martin, McLayea, or even Lee, there was no independent violation to otherwise prompt the officers to stop Defendants. An unlawful search is not sufficiently attenuated if it "tend[ed] significantly to direct the investigation toward the specific evidence to be suppressed." United States v. Davis, 332 F.3d 1163, 1171 (9th Cir. 2003). As discussed further below, without the GPS data, the Court doubts the investigators would have been able to establish physical surveillance of Defendants and conduct the eventual stop. Therefore, the GPS data was crucial in initiating the "chain of events" that lead to the Los Angeles police officers conducting surveillance, viewing the duffle bag exchange, and stopping and searching the truck.

Lastly, the Court considers the official misconduct weighs against the government. At the time the GPS device was installed, government officials did not know that Defendants would take a route similar to the one taken in March 2017 when illegal substances were found. (June 25, 2018 Hr.) Government officials purposely installed the GPS device to see if illegal activity would occur. The government claims that they had reasonable suspicion and probable cause to search Defendants, yet they did not obtain a warrant. (Opp'n at 12.) Defendants claim that the government had advisors and supervisors to seek guidance from but chose not to. (Reply at 3.) Officer Mkrtchyan testified that in general he understood that a warrant is necessary to install a GPS device, but he never reported to a supervisor nor an attorney the absence of a warrant here. (July 9, 2018 Hr. Tr. at 59.) The agents' decision not to seek legal guidance or obtain a warrant, coupled with the almost two-day long use of the GPS devices to verify if Defendants would take a similar route as Karac or if illegal conduct would occur, creates a scenario of significant government misconduct. See Brown v. Illinois, 422 U.S. 590, 604 (1975) (finding officers act with an unlawful purpose when they "embarked upon this expedition in the hope that something might turn up").

In the instant case, the connection between the unconstitutional conduct and the evidence is not sufficiently attenuated as to dissipate the taint of illegality. Thus, the Court concludes there is no exception to the suppression of evidence under the attenuation doctrine.

### 2. Inevitable discovery

The Government asserts the agents would have been able to locate Defendants' Bo-Mak truck in southern California without data from the GPS devices. (Opp'n at 14.) The inevitable discovery exception "allows for the admission of evidence that would have been discovered even without the unconstitutional source." Utah, 136 S. Ct. at 2061. In the Ninth Circuit, the government need not demonstrate the evidence could have been obtained from a previously initiated, independent investigation. Ramirez-Sandoval, 872 F.2d 1392, 1399 (9th Cir. 1989). Rather, the government can meet its burden by establishing by a preponderance of the evidence that "by following routine procedures, the police would inevitably have uncovered the evidence." Id. 1396, 1399.

The government argues the FBI agents believed Defendants would take the same route Karac took in March 2017, based on the messages discussing dry runs after the March 2017 seizure. (Opp'n at 14.) Therefore, the government claims, the agents would have located Defendants' Bo-Mak truck by setting up surveillance units along Karac's route, conducted physical surveillance of the truck once located, observed the suspected drug transaction, and then searched the truck. (Id.) Defendants counter that the route Defendants took was not identical to Karac's and the distance from Michigan to California is so large that any surveillance points the government set up would not have detected the truck. (Reply at 5-6.) Moreover, the point where Defendants' exchange occurred was approximately one mile from Karac's previous location, and the investigators could not have predicted that location. (Id. at 6.)

In Nix, the defendant attempted to suppress the evidence of the victim's body. 467 U.S. at 448. The Supreme Court held the body of the victim would have inevitably been discovered because there were approximately 200 volunteers searching for the body, and the record established the "search parties were approaching the actual location of the body." Id. at 449.

The government cites United States v. Luna-Santillanes, 554 F. App'x 402 (6th Cir. 2014), where the court considered a defendant's motion to suppress after the warrantless application of a GPS device to the vehicle he was in. A confidential source had informed the officers the defendant and others had planned to pick up cocaine the next day in two cars. Id. at 405. After tracking the GPS devices on the cars, and the location of the defendant's phone, for which the officers had a warrant, the officers stopped the vehicles, conducted a search, and found heroin. Id. The Sixth Circuit affirmed the district court's denial of the motion to suppress under the inevitable discovery doctrine, because the officers knew the date of the trip, the cars to be used, the defendant's involvement without the GPS device, and they also obtained the location data from the phone. Id. at 407. Thus, the officers would have "inevitably spotted" the vehicle and been able to conduct the stop. Id.

Here, the government has not carried its burden of establishing it would have inevitably located Defendants' truck without use of GPS data. The government may have had information about Karac's route, but Defendants' route was not identical. As Special Agent Monroe testified, before placing the GPS trackers on Defendants' truck, law enforcement had no date and

time of a drug hand-off or retrieval, and had no specific information from the informant regarding a specific date and time.  (June 25, 2018 Hr.)  No independent source provided location data to the agents as in Luna-Santillanes.  A one-mile discrepancy in the exchange locations between Karac's handoff and Defendants' handoff is a significant difference.  The Court is not convinced the government agents would have detected Defendants' truck on the multi-thousand-mile journey even if the agents had employed various surveillance methods along Karac's route.  The Court concludes the inevitable discovery doctrine does not apply here.

### 3. Good faith exception

The government argues that even if the evidence is not admissible under the attenuation or inevitable discovery doctrines, the good faith exception permits its admission.  (Opp'n at 24.)  Evidence obtained during a search conducted in "reasonable reliance on binding precedent" is not subject to the exclusionary rule.  Davis, 564 U.S. at 241.  Binding appellate precedent need not "constitute a factual match with the circumstances of the search in question for the good-faith exception to apply," but may include established legal principles.  United States v. Lustig, 830 F.3d 1075, 1082 (9th Cir. 2016).

The government asserts that at the time the trackers were installed on Defendants' truck, there was no case law suggesting anything more than reasonable suspicion was required in the context of a border search.  (Opp'n at 25.)  While the government is correct that precedent permits warrantless border searches and requires reasonable suspicion for some intrusive searches, the search here does not fit within the border search or extended border search doctrines.  Thus, binding appellate precedent concerning the discrete searches in cases such as Flores-Montano does not inform the good-faith exception analysis.

Rather, Jones appears to be the only binding precedent applicable to the legal principles at issue here.  There, the Supreme Court held the placement of a GPS device on a vehicle was a "search" within the meaning of the Fourth Amendment, which subjected such actions to the warrant requirement.  Moreover, the government has not identified any binding precedent that analyzes any carved-out exceptions to the warrant requirement for placing a GPS device.  Thus, under Jones the relevant precedent established a warrant was needed to install a GPS device.

The government introduces evidence that the FBI agents acted on information from HSI Special Agents Gernatt and Abair that border agents were "authorized to install GPS trackers on any vehicle at the border without a warrant so long as the GPS monitoring did not exceed 48 hours, and that the 48-hour rule did not apply to commercial vehicles, such as semi-trucks" per HSI policy.  (Monroe Decl. ¶ 14; see also Mkrtchyan Decl. ¶ 6; June 25, 2018 Hr.)  Special Agent Monroe also testified that her training is to defer to HSI and CBP on border issues.  (June 25, 2018 Hr.)  Monroe stated that she never checked with an Assistant United States Attorney, a Department of Justice attorney, or an FBI attorney regarding the legality of HSI's policy or the application of the GPS devices.  (Id.)

    The Court is not persuaded the good faith exception stretches to encompass the government's reasoning for its application. There is no evidence the agents were advised by an attorney that they need not obtain a warrant. Nor has the government been able to point the Court to any precedent that could have served as a basis for the purported 48-hour rule or its looser application to semi-trucks. The good faith exception must be based on reasonable reliance on binding precedent, not on an agent's understanding of the agency's policy or what the law might be. On these facts, the Court concludes the good-faith exception does not prevent the application of the exclusionary rule to the agents' placement of the GPS devices on Defendants' truck and trailer.

    Further, the Court determines the benefits of deterrence here outweigh the costs of the application of the exclusionary rule. Permitting agents to apply GPS trackers to any vehicle at the border and subsequently monitor its location without first obtaining a warrant flies in the face of Jones, which holds that the installation of a GPS device constitutes a search under the Fourth Amendment. The government agents here did not seek legal advice on their decision to install the GPS devices, and chose instead to rely on two HSI agents' understanding of the law. This choice is exactly what the Davis Court declined to authorize by requiring a search rely on "binding appellate precedent." 564 U.S. at 249.

## V.    CONCLUSION

    The installation and monitoring of the GPS trackers on Defendants' truck and trailer, without a warrant, violated Defendants' Fourth Amendment rights, and the exclusionary rule requires exclusion of evidence obtained through use of those GPS trackers. Accordingly, the Court GRANTS Defendants' motion to suppress evidence.

**IT IS SO ORDERED.**